JOHN BERKERY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 13900-82,     Filed July 29, 1988.
22182-82.

*Ronald F. Kidd, Thomas W. Ostrander,* and *Mark E. Cedrone,* for the petitioner.

*Ina S. Weiner* and *Lynn L. Casimir,* for the respondent.

WELLS, *Judge:* These cases are before us on petitioner's motion to vacate our decisions in these cases, which we took under advisement when such motion was filed. The parties have filed a joint stipulation, in which they agreed that the Court's decisions in these cases should be vacated, and that "based on the record as previously submitted and closed in April of 1987," we should consider the issues advanced by petitioner that we did not consider in our opinion at 90 T.C. 259 (1988).[1]

We herewith vacate those decisions,[2] and therefore will consider the following issues: (1) Whether respondent's

---

[1] The parties agree that the conditions for vacating our decisions, as set forth in our opinion at 90 T.C. 259, 266 (1988), have been satisfied.

[2] We do not, however, withdraw our opinion.

determinations in these cases, as embodied in his statutory notices of deficiency, should be presumed correct; and (2) whether for taxable years 1980 and 1981, petitioner failed to report taxable income from alleged illegal transactions involving P-2-P, and therefore is liable for deficiencies in and additions to Federal income taxes.

## SUPPLEMENTAL FINDINGS OF FACT

*Respondent's Determinations and Tax Court Proceedings*

In *Berkery v. Commissioner,* 90 T.C. 259 (1988), we found facts, including certain stipulated facts, pertinent to the issues decided therein. Unless otherwise stated herein, we adopt those facts for purposes of these supplemental findings of fact. For clarity, we will restate the facts found in *Berkery v. Commissioner, supra,* that are pertinent to our supplemental opinion herein.

At all times relevant to these cases, the Special Enforcement Unit of the Internal Revenue Service's Examination Division employed Harry J. Schmidt (Schmidt) as a revenue agent. The Special Enforcement Unit conducts audits and investigations of individuals alleged to be involved in illegal activities, and uses its findings for purposes of civil tax examinations.

In December 1981, Schmidt was informed by an agent of the Internal Revenue Service's Criminal Investigation Division (C.I.D.) about various documents seized from petitioner by the United States Customs Department (Customs). Those documents were forwarded to Schmidt, and included the following: two passports, one in petitioner's name (i.e., John C. Berkery), and one in the name of John Carlyle, another name used by petitioner; banking records indicating that petitioner had bank accounts in several foreign countries; and documents relating to the formation and operation of three Panamanian corporations. After reviewing the seized documents, as well as Bureau of Labor statistics and petitioner's tax returns, Schmidt determined that petitioner was not reporting all of his income on his tax returns, that petitioner was attempting to leave the United States and move his assets out of the United States, and that by leaving the United States and moving his assets out of the

United States, petitioner would compromise future efforts of the Internal Revenue Service to collect taxes allegedly owed by petitioner. Based on Schmidt's determinations, on December 14, 1981, a termination assessment was made against petitioner for the period from January 1, 1981, through December 11, 1981.

Later, Schmidt read a newspaper article dated January 10, 1982, that reported that law enforcement sources thought they had developed enough evidence to indict petitioner and other individuals on charges of conspiring to distribute phenyl-2-propanone (P-2-P), an ingredient used to manufacture methamphetamine.[3] Schmidt then made telephone calls to the Federal Bureau of Investigation (F.B.I.) and the Department of Justice to find out whether the newspaper article was accurate. At such time, Schmidt was not able to contact agency officials familiar with petitioner's case, and left telephone messages for such officials, asking that they return his telephone calls. Schmidt's telephone calls, however, were not returned.

Petitioner was indicted by a grand jury on January 13, 1982, on the following charges: (1) One count of unlawfully conspiring to distribute P-2-P and to possess P-2-P with the intent to distribute such P-2-P (hereinafter referred to as unlawfully conspiring to distribute and possess P-2-P), in violation of 21 U.S.C. section 846; (2) nine counts of unlawfully possessing P-2-P with the intent to distribute such P-2-P (hereinafter referred to as unlawfully possessing P-2-P), in violation of 21 U.S.C. section 841; and (3) four counts of unlawfully distributing methamphetamine, in violation of 21 U.S.C. section 841.[4]

Each of the nine indictment counts in which petitioner was charged with unlawfully possessing P-2-P specified a different occasion on which the alleged offense occurred, and the number of gallons of P-2-P that petitioner possessed on

---

[3]P-2-P is a Schedule II controlled substance under 21 U.S.C. sec. 812 and 21 C.F.R. sec. 1308.12.

[4]There were 15 counts in the indictment. In one count, the grand jury charged petitioner and his co-defendants, Raymond Martorano and Frank Vadino, with unlawfully conspiring to distribute and possess P-2-P. In 9 counts, the grand jury charged petitioner with unlawfully possessing P-2-P. In 1 count, the grand jury charged petitioner's co-defendants with unlawfully possessing P-2-P, as well as with aiding and abetting. In 4 counts, the grand jury charged petitioner with unlawfully distributing methamphetamine.

Neither petitioner nor his co-defendants were charged by the grand jury with distributing P-2-P.

such occasion. Those counts indicated that petitioner unlawfully possessed a total of 104 gallons of P-2-P in 1980, and a total of 108 gallons of P-2-P in 1981.

It was stated in the one indictment count in which petitioner was charged with unlawfully conspiring to distribute and possess P-2-P that petitioner "would and did buy P-2-P from Ronald Raiton at a price of $60,000 to $70,000 per purchase or $2,500 per gallon of P-2-P." It was also stated in that same count that petitioner "would and did resell the P-2-P purchased from Ronald Raiton at a price of $5,500 to $7,500 per gallon."

On January 14, 1982, Schmidt was contacted by the C.I.D. and was informed by that division that an indictment was returned against petitioner on the prior day. Schmidt then contacted Louis Pichini (Pichini), of the U.S. Department of Justice. Schmidt asked Pichini several questions, to which Pichini responded that he could provide Schmidt with a copy of the indictment; Pichini then provided a copy of the indictment to Schmidt.

Schmidt also made telephone calls to F.B.I. "representatives," attempting to obtain information about petitioner's criminal case, but those representatives were not available to speak with Schmidt and did not return telephone messages left by Schmidt. Schmidt then visited F.B.I. offices to attempt to obtain information about petitioner's criminal case. He was told by a secretary, however, that no information was available for him.

After obtaining the indictment in petitioner's criminal case, Schmidt prepared a report concerning petitioner's taxable year 1980, to which his reviewer, William Stunder, added certain comments, and Schmidt also prepared a report concerning petitioner's taxable year 1981. The report prepared for petitioner's taxable year 1980 was dated January 20, 1982, and the report prepared for petitioner's taxable year 1981 was dated January 21, 1982. (Hereinafter, each of these reports will be referred to in the singular as an examination report, and both of these reports will be referred to in the plural as the examination reports.)

In the examination report for petitioner's taxable year 1980, Schmidt determined that petitioner bought 104 gallons of P-2-P for $2,500 per gallon during such year.

Schmidt further determined in such report that petitioner sold those 104 gallons of P-2-P for $7,500 per gallon during such year, and that petitioner therefore had a "net profit" of $520,000[5] from his P-2-P sales during his taxable year 1980. Schmidt concluded in such report that a jeopardy assessment was warranted for petitioner's taxable year 1980.

In the examination report for petitioner's taxable year 1981, Schmidt determined that petitioner bought 108 gallons of P-2-P for $2,500 per gallon during such year. Schmidt further determined in such report that petitioner sold those 108 gallons of P-2-P for $5,500 per gallon during such year, and that petitioner therefore had a "net profit" of $324,000[6] from his P-2-P sales during his taxable year 1981. After recognizing that there had already been a termination assessment for a portion of petitioner's taxable year 1981, Schmidt concluded in such report that a second termination assessment was warranted for petitioner's taxable year 1981.[7]

A jeopardy assessment was made with respect to petitioner's taxable year 1980, and a second termination assessment was made with respect to petitioner's taxable year 1981. Both assessments were based upon the examination reports.

On March 18, 1982, a statutory notice of deficiency was sent to petitioner with respect to his taxable year 1980, and on June 10, 1982, a statutory notice of deficiency was sent to petitioner with respect to his taxable year 1981. Just as the foregoing assessments, both notices were based upon the examination reports.

Subsequently, petitioner's counsel filed petitions with this Court on behalf of petitioner in a timely manner. Petitioner

---

[5]The examination report for 1980 stated as follows:

| | | |
|---|---|---|
| Sales | 104 gallons at $7,500 = | $780,000 |
| Cost of goods | 104 gallons at $2,500 = | 260,000 |
| Net profit | | 520,000 |

[6]The examination report for 1981 stated as follows:

| | | |
|---|---|---|
| Sales | 108 gallons at $5,500 = | $594,000 |
| Cost of goods | 108 gallons at $2,500 = | 270,000 |
| Net profit | | 324,000 |

[7]Specific portions of the examination reports are cited by petitioner as proof that Schmidt violated Fed. R. Crim. P. 6(e). Those portions of the examination reports are set forth and discussed *infra.*

was a fugitive from justice at such time, and he remained a fugitive from justice at the time these cases were tried and briefed.

We filed an opinion in these cases on February 16, 1988. Petitioner is no longer a fugitive from justice.[8]

## Government "Sting" Operation

Ronald Raiton (Raiton), a P-2-P dealer, began cooperating with Federal law enforcement officials in or about April 1981. His cooperation was enlisted as part of an attempt by Federal law enforcement officials to develop criminal cases against many individuals with whom Raiton dealt.[9] In the past, Raiton had pleaded guilty to over 131 counts involving mail fraud[10] and had been found guilty of conspiring to distribute cocaine (21 U.S.C. sec. 846), possessing cocaine with the intent to distribute such cocaine (21 U.S.C. sec. 841(a)(1)), and aiding and abetting (18 U.S.C. sec. 2(a)). Beginning on May 2, 1981, Raiton taped several conversations to which he and petitioner were parties. Topics of those conversations included sales of, or payment for, P-2-P.

Raiton signed agreements with the Federal Government that required Raiton to be an informer; one such agreement was signed on June 11, 1981, and another was signed in October or November 1981. Aside from requiring Raiton's continuing services as an informer, the terms of the latter agreement included the following: (1) Raiton would testify "truthfully and completely before the Federal Grand Jury and during any subsequent hearing or trial, related to the matters [then] under investigation, when called upon to do so by the Federal Government"; (2) Raiton would "make himself reasonably available for all interviews, Grand Jury testimony, related hearings, and trial appearances when so requested by * * * the Federal Government"; (3) Raiton would withdraw his appeal of a case, criminal No. 79-203-2, in which he was convicted "of conspiracy to distribute a controlled substance (cocaine) and possession of a controlled

---

[8]We were notified by petitioner's motion that petitioner no longer was a fugitive from justice, and the parties subsequently stipulated that fact.

[9]Prior to cooperating with Federal law enforcement officials, Raiton had been an informant for the Philadelphia police.

[10]In those counts, Raiton was charged with crimes that included mail fraud (18 U.S.C. sec. 1341), conspiracy (18 U.S.C. sec. 371), and aiding and abetting (18 U.S.C. sec. 2).

substance (cocaine) with intent to distribute" (for which Raiton was sentenced to 5 years in prison, to be followed by 3 years of special parole); (4) Raiton would plead guilty to two counts of an indictment to be based upon an investigation of his "illegal activities in connection with the distribution of [P-2-P] and methamphetamine"; (5) "The Federal government [would] not bring any further criminal charges in any way based upon Ronald Raiton's prior dealings in cocaine, [P-2-P] and methamphetamine, including but not limited to any criminal income tax, customs or fraud violations"; (6) in accordance with rule 11(e)(1)(c) of Federal Rules of Criminal Procedure, the appropriate prison sentence for Raiton for purposes of the P-2-P and methamphetamine case was 6.5 years, which was to run concurrently with Raiton's 5-year prison sentence in criminal No. 79-203-2; (7) the Federal Government would not take any position on a request made by, or on behalf of, Raiton for parole; and (8) after service of Raiton's prison sentence, and consistent with the terms of Raiton's parole, Raiton could petition for the return of his passport and the Federal Government would not object to the petition.

As he agreed, Raiton pleaded guilty to indictment counts that were based upon Raiton's illegal activities in connection with the distribution of P-2-P and methamphetamine. Raiton also testified before the grand jury that indicted petitioner, and subsequently testified before this Court during the trial of the instant cases.

SUPPLEMENTAL OPINION

## Presumption of Correctness

Petitioner contends that respondent's determinations, as embodied in the statutory notices of deficiency sent to petitioner, should not be presumed correct because the assessments that preceded those determinations were "naked" assessments without foundation, and consequently, those determinations are without foundation. According to petitioner, both the assessments and the determinations lack any foundation for either of the following reasons:

(1) They were based upon evidence either disclosed to Schmidt in violation of rule 6(e) of the Federal Rules of

Criminal Procedure (hereinafter referred to as rule 6(e)) or obtained as a result of such disclosure, and therefore, according to petitioner, that evidence could not be used to formulate respondent's assessments and determinations, and must be excluded from the record herein; or

(2) Respondent has not introduced sufficient evidence to link petitioner to P-2-P sales during the taxable years in issue.

It is well settled that respondent's determinations, as embodied in his statutory notices of deficiency, generally are presumed correct. *Welch v. Helvering,* 290 U.S. 111 (1933). When, however, respondent's determinations are shown to be arbitrary and excessive (e.g., without "factual foundation" or "rational basis"), the presumption evaporates, and the burden of going forward with evidence shifts to respondent. *Helvering v. Taylor,* 293 U.S. 507, 514-515 (1935); *De Cavalcante v. Commissioner,* 620 F.2d 23, 27-28 (3d Cir. 1980), affg. a Memorandum Opinion of this Court; *Dellacroce v. Commissioner,* 83 T.C. 269, 280 (1984).

When a taxpayer asks this Court to find a statutory notice of deficiency to be arbitrary and excessive, he is asking this Court to look behind that notice. As a general rule, this Court will not honor such a request, even though the determination may have been based upon hearsay or other inadmissible evidence. *Dellacroce v. Commissioner,* 83 T.C. at 280. The underlying rationale for the general rule is that a trial before this Court is a proceeding de novo, and determinations therefore are to be based upon the merits of the case, and not upon the record developed at the administrative level. *Greenberg's Express, Inc. v. Commissioner,* 62 T.C. 324, 328 (1974).

We have recognized exceptions to the general rule, however, in cases where there has been substantial evidence of unconstitutional conduct by respondent in determining the deficiency (*Riland v. Commissioner,* 79 T.C. 185, 201 (1982); *Greenberg's Express, Inc. v. Commissioner,* 62 T.C. at 327; *Suarez v. Commissioner,* 58 T.C. 792, 814 (1972), overruled in part *Guzzetta v. Commissioner,* 78 T.C. 173, 184 (1982)), and in unreported illegal income cases where "respondent introduced no direct or substantive evidence, but rested on the presumption of correctness and the

taxpayer challenged the notice of deficiency" on the ground that it was arbitrary (*Shriver v. Commissioner*, 85 T.C. 1, 3 (1985)). Petitioner argues that the instant cases are governed by both these exceptions to the general rule.

## (A) Illegal Disclosures

In the instant cases, because respondent did not object, we need not address the question of under what circumstances the Court will examine the factual underpinnings of respondent's statutory notices for purposes of determining whether there was a violation of rule 6(e). With that preliminary question out of the way, we will proceed to make such an examination.

Petitioner contends as follows: (1) That Raiton, an informer who testified before the grand jury that indicted petitioner, spoke to C.I.D., F.B.I., and Drug Enforcement Agency agents, and possibly to other Government agents; (2) that those agents were "agents of the grand jury"; (3) that the information they possessed was "before the grand jury"; and (4) that such information was disclosed to Schmidt by "sources" connected with the grand jury, in violation of rule 6(e), and then used by Schmidt to draft the examination reports.[11] Thus, according to petitioner, information was illegally relied upon by Schmidt and must be excluded from the record herein, the burden of going forward with untainted evidence to support his determinations then shifted to respondent, and because that burden has not been satisfied, decisions must be entered in petitioner's favor.[12]

Respondent argues that petitioner has not established that there were disclosures to Schmidt in violation of rule 6(e). Pursuant to the analysis that follows, we agree with respondent.

---

[11]The parties agree that respondent's statutory notices of deficiency were based upon the examination reports. Therefore, if those reports were based upon illegally obtained information, the notices also would be based upon such information.

[12]Petitioner cites to *Suarez v. Commissioner*, 58 T.C. 792 (1972), overruled in part *Guzzetta v. Commissioner*, 78 T.C. 173, 184 (1982), and *Cohen v. Commissioner*, a Memorandum Sur Order of this Court, unofficially reported at 42 T.C.M. 312, 50 P-H Memo T.C. par. 81,901 (1981), in support of his argument about the effects of a rule 6(e) violation. Before deciding the effect of a rule 6(e) violation, we obviously must first find that there was such a violation. We emphasize, however, that our Memorandum Sur Order in *Cohen* is of no precedential value.

Rule 6(e) "codifies the traditional rule of grand jury secrecy" (*United States v. Sells Engineering, Inc.*, 463 U.S. 418, 425 (1983)), and provides that "matters occurring before the grand jury" shall not be disclosed by individuals fitting into one of several enumerated classes.[13] Thus, to find in the instant cases that there was a violation of rule 6(e), we must not only find that information was disclosed to Schmidt concerning a criminal case that the Federal Government was trying to develop against petitioner, but also that any individuals who made such disclosures were within one of the classes enumerated in rule 6(e) and that disclosure of such information constituted a disclosure of "matters that occurred before the grand jury" that indicted petitioner.

To support his contention that sources connected with the grand jury disclosed evidence against petitioner to Schmidt, petitioner relies upon various statements made by Schmidt in the examination reports and what petitioner characterizes as indications in those reports that they were altered to conceal those disclosures.

First, petitioner relies upon a statement that was contained in both examination reports. The relevant portion of each of those reports states as follows: [14]

This report is the result of an F.B.I. undercover operation aimed at identifying and prosecuting individuals involved in narcotics trafficking.

The result of this operation "Limestone", 38 individuals were indicted. *The facts contained in the report were obtained from various sources including newspaper articles, Department of Justice and F.B.I. representatives.*

---

[13]The relevant portion of rule 6(e), provides as follows:

"(2) General Rule of Secrecy. A grand juror, an interpreter, a stenographer, an operator of a recording device, a typist who transcribes recorded testimony, an attorney for the government, or any person to whom disclosure is made under paragraph (3)(A)(ii) of this subdivision [i.e., 'government personnel * * * as are deemed necessary by an attorney for the government to assist an attorney for the government in the performance of such attorney's duty to enforce federal criminal law'] shall not disclose matters occurring before the grand jury except as otherwise provided for in these rules. * * *"

Rule 6(e) does not impose an obligation of secrecy on witnesses appearing before a grand jury, unless those witnesses also "happen to fit into one of the enumerated classes." *United States v. Sells Engineering, Inc.*, 463 U.S. 418, 425 (1983).

[14]The examination report for 1980 was handwritten. Schmidt then photocopied the portion of that report containing the statements that follow above in the text of this supplemental opinion, and made that photocopy part of the report for 1981, which otherwise was handwritten.

The information included in this report was gathered apart from the Federal grand jury and therefore available.
[Emphasis supplied.]

Petitioner argues that the emphasized portion of the foregoing excerpt is an admission that information relied upon for the examination reports was obtained in violation of rule 6(e), despite (1) a statement in those reports and (2) Schmidt's testimony before this Court, both indicating that such rule was not violated.

At trial, Schmidt testified that he prepared the examination reports based exclusively on (1) newspaper articles about petitioner and his codefendants, and (2) the indictment against petitioner and his codefendants. Schmidt also testified during the trial of the instant cases that (1) the statement about the sources of information for the examination reports was made to document Schmidt's telephone calls to the agencies mentioned therein and not to indicate that information about grand jury proceedings was given to him by people at those agencies, and (2) that although he did make telephone calls to people at the F.B.I. and at the Department of Justice to obtain information about petitioner, he only was able to obtain a copy of the indictment by doing so. According to Schmidt, no one at the agencies listed in the examination reports discussed petitioner's case with him in response to his telephone calls, and aside from the indictment against petitioner, only the following information and documents were given to him by Government agents:

(1) Agents employed by the C.I.D. informed Schmidt that petitioner had been stopped by Customs and that the C.I.D. would be forwarding to Schmidt certain documents found in the possession of petitioner;

(2) Agents employed by the C.I.D. sent Schmidt the documents seized by Customs from petitioner; [15]

(3) Agents employed by the C.I.D. informed Schmidt that an indictment was issued against petitioner; and

(4) Revenue agents employed by the Special Enforcement Unit of the Internal Revenue Service's Examination Division gave Schmidt general information about petitioner and

---

[15]These are the documents that were used by the Service to make a termination assessment with respect to petitioner's taxable year 1981.

told Schmidt how to acquire more information about petitioner.[16]

Petitioner contends that both Schmidt's testimony and his statement that information was obtained "apart from the Federal grand jury" were "less than truthful,"[17] and that Schmidt's motivation for being less than truthful was his personal interest in making sure that he was not found to have used illegally disclosed grand jury information. Petitioner does not argue, however, that any of the sources of information upon which Schmidt admits he relied were based upon disclosures in violation of rule 6(e).

Although we recognize that a revenue agent in Schmidt's position has a keen interest in protecting a case that he has developed against a taxpayer, we disagree with petitioner's characterization of Schmidt's testimony as being less than truthful. We closely observed Schmidt's demeanor, and we found Schmidt to be a very credible witness who was doing his best to remember the specific sources of information he relied upon to draft the examination reports almost 5 years prior to testifying in these cases. We believe his explanation for inserting in the examination reports the statement about his sources of information. We therefore do not construe that statement as an admission that he received information from Government agents concerning the criminal case they were attempting to develop against petitioner.

Next, petitioner relies upon the following statements contained in the examination reports to prove a violation of rule 6(e), contending that such statements were not based on information contained in either the newspaper articles or the indictment relied upon by Schmidt:

(1) A statement contained in both examination reports that "The taxpayer presently being examined made purchases during the operation and has been indicted and the *money used to make the purchases is presently being held by the F.B.I. as evidence*" (emphasis supplied);

---

[16]More specifically, Schmidt testified that his peers in the Special Enforcement Unit, who had more experience than he, provided him with a Pennsylvania Crime Commission report on petitioner and "general background information" about petitioner. Petitioner does not contend that the disclosure of that report or of the background information constituted the disclosure of a "matter occurring before the grand jury."

[17]Schmidt characterized as "superfluous" the statement in the examination reports about the specific sources of information, and petitioner's response on brief to such characterization is, "By claiming the language is 'superfluous' Schmidt is again being less than truthful."

(2) A statement contained in the examination report for petitioner's taxable year 1980 that "In 1981, the $2,500.00 remains unchanged *while his sales price dropped to $5,500.00*" (emphasis supplied); and

(3) A statement contained in the examination report for petitioner's taxable year 1980 that "T/P paid $70,000.00 for the 28 gallons (*$20,000 Canadian dollars + $50,000 U.S. currency*)" (emphasis supplied).

Petitioner contends that the emphasized portions of the foregoing statements were not disclosed by either the newspaper articles or the indictment that Schmidt claims he relied upon.

As we have already noted, based upon our observation of Schmidt as a witness in this case, we found him credible. We therefore believed his testimony about his sources of information for the examination reports.

Moreover, it is not apparent that the emphasized portions of the foregoing statements were not based upon the sources of information upon which Schmidt claims he relied. We base this conclusion on the newspaper articles in evidence, as well as Schmidt's testimony.

Portions of several of the newspaper articles in evidence in these cases are not legible, and we therefore are unable to determine whether the illegible portions of the articles failed to contain information upon which the emphasized portions of the foregoing statements could be based.

Moreover, there are newspaper articles in evidence that contain information upon which two of the three statements could have been based. First, with respect to the statement that the F.B.I. was holding as evidence "the money used to make the purchases," a portion of one article in evidence states as follows:

In effect, [Ronald] Raiton—and those running the investigation—"stung" the dealers [including petitioner] for $306,000.[18] U.S. Attorney Peter Vaira, speaking broadly about Federal stings, said any revenue generated goes to help pay costs of the operation. [The Bulletin, January 10, 1982, at A 10.]

Another newspaper article in evidence (The Bulletin, June 14, 1982, at A 4) states, "authorities 'stung' the defendants

---

[18]This number, as it appears in our copy of the article, is not clearly legible.

[including petitioner] for $380,000 in cash and confiscated $280,000 in finished methamphetamine." Yet another article in evidence (Philadelphia Daily News, Jan. 11, 1982, at 4) states, "an elaborate undercover operation * * * stung them [including petitioner] for more than $370,000 in cash and 'several hundred thousand dollars' in drugs, according to sources," and also that "IN ADDITION TO ILLICIT drug money, law enforcement officials were able to obtain 'several hundred thousand dollars' worth of methamphetamine." (Emphasis in original.) Upon reading those excerpts, one could reasonably infer that the F.B.I. was holding "the money used to make the purchases," and this would support Schmidt's testimony that he relied upon newspaper articles and the indictment against petitioner for purposes of drafting the examination reports.[19]

Second, with respect to the statement contained in the examination report for taxable year 1980 that "In 1981, the $2,500.00 remains unchanged while his sales price dropped to $5,500.00," Schmidt testified that he based such statement on the statement in the indictment that petitioner "would and did resell the P2P * * * at a price of $5,500 to $7,500 a gallon," and also testified that he may have based such statement on newspaper articles. Schmidt testified that he used the "most aggressive amount or $7,500" as the sales price for P-2-P for petitioner's taxable year 1980 because a jeopardy assessment was going to be made for such year and a statutory notice of deficiency therefore would be issued within 60 days of the assessment. According to Schmidt, those procedures allowed respondent only a short time to review the report to make adjustments thereto before issuing a statutory notice of deficiency. Such explanation also was provided by Schmidt in the examination report for petitioner's taxable year 1980.[20] Although it is true that the legible portions of the newspaper articles and the indictment in evidence do not specifically state that petitioner's sales price for P-2-P "dropped," we find that

[19]One article in evidence that is not completely legible (Philadelphia Daily News, Jan. 14, 1982, at 12) *seems* to indicate that the Government seized cash and drugs during an undercover "sting" operation. If that article makes such a statement, petitioner's claim that information about the F.B.I.'s holding money was not contained in any of the articles in evidence in this case, would be further undercut.

[20]The examination report states, "This agent feels that a computation of $5,500.00 is being conservative. The sales price will be reconsidered [at] time of full year follow up."

Schmidt's explanation for his use of the term "dropped" was reasonable, and his testimony convinces us that he did not receive such information from sources connected with the grand jury.

Remaining is the statement about the amount of "Canadian dollars" and "U.S. currency" petitioner allegedly paid for 28 gallons of P-2-P. When questioned about that statement, and after being shown the newspaper articles and the indictment in evidence, Schmidt testified that he did not see such specific information in the articles or indictment. Schmidt also testified, however, that he did not speak to Government agents about the evidence of P-2-P sales they had against petitioner, and that he may have relied upon newspaper articles not in evidence for purposes of writing the statement about the currency, as well as for purposes of writing other statements contained in .the examination reports.[21] Based upon Schmidt's testimony, we are convinced that he did not receive information from Government agents about the amount of "Canadian dollars" and 'U.S. currency' petitioner allegedly paid for P-2-P.

Last, petitioner argues that, in an effort to . conceal violations of rule 6(e), Schmidt altered the examination reports by inserting the statement that "The information included in this report was gathered apart from the Federal grand jury and therefore available." According to petitioner, evidence of that alteration includes the following:

(1) The statement *appears* to have been written with a different writing instrument than that used by Schmidt to write the paragraphs above and below that statement, as well as Schmidt's signature; and

(2) Copies of the examination reports that were provided to petitioner were copied in less than a complete manner.

We examined the statement about the availability of information and compared its appearance to the appearance of the paragraph above it, and cannot conclude on our own that the statement was written with a different writing instrument. We also compared the statement's appearance

---

[21]Petitioner argues that he asked respondent during discovery for *all* sources of information relied upon by Schmidt in preparing his examination report, and that no articles other than those in evidence were disclosed. Petitioner, however, did not introduce any such evidence and did not confront Schmidt with such facts at trial in an attempt to impeach Schmidt's credibility.

to the appearance of Schmidt's signature and the paragraph that followed that statement,[22] and it appears that the statement may have been written with a different writing instrument. Nevertheless, we are not convinced, based upon that apparent difference, that there was a violation of rule 6(e).

With regard to petitioner's complaint that the examination reports with which he was provided were copied in less than a complete manner, the only lines omitted from the copy of the examination report for 1980 that was provided to petitioner by respondent were as follows:

(1) On the top of one page, the first line, which stated, "Re — Termination";

(2) On the bottom of another page, the last line, which is reflected by the following emphasized language: "This meets the requirement for termination *assessment under policy statement P-4-89 and 4585.*"

We find that the omissions were inadvertent and, in any event, were of information that was not material for purposes of petitioner's cases. Consequently, we also find that such omissions do not prove that Schmidt was trying to conceal a violation of rule 6(e).

After carefully reviewing Schmidt's testimony in light of the other evidence presented in these cases, and after observing Schmidt's demeanor as a witness in the instant proceedings, we find Schmidt to have been credible and his testimony about the limited amount of information he received from various agents of the Federal Government to have been truthful. We therefore find that, other than the disclosures that Schmidt admits were made to him, there were no disclosures to Schmidt by sources connected with the grand jury of evidence obtained by the Government for purposes of obtaining an indictment against petitioner.

Since we have found that, other than the disclosures that Schmidt admits were made to him, there were no disclosures of information to Schmidt by Government agents, we obviously need not decide whether any such disclosures were of "matters occurring before the grand jury," whether

---

[22]The paragraph that followed the statement was on the next page of the examination report, and it appears to us that such page was written in full with the same writing instrument.

any such disclosures were made by individuals fitting into the classes set forth in rule 6(e)(2), or whether the exclusionary rule would apply to evidence presented by respondent in the instant cases if there were a violation of rule 6(e).

## (B) Evidence Linking Petitioner to Activity

The Court of Appeals for the Third Circuit, to which an appeal of the instant cases would lie,[23] has held that "a court must not give effect to the presumption of correctness in a case involving unreported income if the Commissioner cannot present 'some predicate evidence connecting the taxpayer to the charged activity.' *Gerardo v. Commissioner,* 552 F.2d 549, 554 (3d Cir. 1977)." *Anastasato v. Commissioner,* 794 F.2d 884, 887 (3d Cir. 1986), affg. a Memorandum Opinion of this Court. The rule was formulated in recognition of the difficulties inherent in proving the nonreceipt of income. *Anastasato v. Commissioner, supra.* When determining whether the evidentiary burden imposed by the rule has been satisfied, the Court of Appeals for the Third Circuit has looked only at the evidentiary record. See *Anastasato v. Commissioner,* 794 F.2d at 888; *Walker v. Commissioner,* 757 F.2d 36 (3d Cir. 1985), revg. a Memorandum Opinion of this Court; *DeCavalcante v. Commissioner,* 620 F.2d 23, 27-28 (3d Cir. 1980); *Gerardo v. Commissioner,* 552 F.2d at 554.[24]

Petitioner argues that, even if we were to find that there were no rule 6(e) violations giving rise to the determinations against petitioner (as we have found), respondent still has not introduced the necessary evidence connecting petitioner to the charged activity (i.e., the distribution of P-2-P). Petitioner bases his argument on three grounds.

The first ground given by petitioner for his argument is that respondent cannot satisfy his evidentiary burden unless he introduces into the record admissible evidence

[23]We held in our prior opinion in these cases that petitioner was a resident of Philadelphia, Pennsylvania, at the time the petitions in these cases were filed. 90 T.C. at 261. Since Philadelphia, Pennsylvania, is within the Third Circuit, we are bound by decisions in that circuit. *Golsen v. Commissioner,* 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971).

[24]See also *Dellacroce v. Commissioner,* 83 T.C. 269, 283-284 (1984) (interpretation of "naked" assessment cases decided by the Court of Appeals for the Second Circuit to require evidence in the record admissible to establish the truth of the facts asserted by the Commissioner); *Piazza v. Commissioner,* T.C. Memo. 1985-222 (interpretation of "naked" assessment cases decided by the Court of Appeals for the Third Circuit to require that the linking evidence be evidence admissible in this Court).

*relied upon by respondent for purposes of preparing statutory notices of deficiency.* Petitioner reasons that such reliance is necessary because "the 'naked assessment' rule concerns itself with the evidentiary base of the statutory notices of deficiency."

The parties agree that for purposes of preparing the notices of deficiency in the instant cases, respondent did not directly rely upon the recording tapes of conversations involving petitioner and Raiton or upon information supplied by Raiton to Schmidt; such evidence was heavily relied upon in the instant cases for purposes of linking petitioner to the alleged income-producing activity. Nevertheless, for purposes of determining whether respondent has satisfied his evidentiary burden in illegal income cases, we have never required respondent to prove that the evidence introduced by respondent was relied upon either to make an assessment or prepare a notice of deficiency, and neither has the Court of Appeals for the Third Circuit.[25]

Moreover, as noted, the articulated policy for the rule requiring respondent to introduce evidence connecting a taxpayer with the activity from which income is alleged to have been received, is that it otherwise would be difficult for the taxpayer to prove a negative (i.e., that he did not receive income from the activity). See *Anastasato v. Commissioner,* 794 F.2d at 887. That policy is not furthered by requiring respondent to rely upon admissible evidence to prepare a statutory notice.

Last, as we also have noted, in unreported illegal income cases, absent substantial evidence of unconstitutional conduct by respondent in determining a deficiency, we will not look behind respondent's statutory notice of deficiency unless respondent has failed to introduce any "direct or substantive evidence" and the taxpayer has challenged the statutory notice as arbitrary. See *Shriver v. Commissioner,* 85 T.C. at 3. Petitioner's proposed rule, however, would require a strained reading of the foregoing exception, as it would require that we first look behind respondent's notice of deficiency *in the course of* determining whether respon-

---

[25]Petitioner fails to cite any cases setting forth such a requirement and our research has disclosed no such case in any Federal judicial circuit.

dent has introduced the necessary evidence, rather than *after* such determination.

Based upon the foregoing, we hold that respondent need not prove that the evidence introduced at trial was relied upon for making an assessment or preparing a notice of deficiency.

The second ground given by petitioner for his argument that respondent has not introduced the necessary predicate evidence in these cases is that Raiton, whose testimony was heavily relied upon to establish the necessary link between petitioner and the alleged income-producing activity, was without credibility and "a chronic liar." We disagree with petitioner's characterization of Raiton's credibility, despite the evidence before us that indicates that Raiton's credibility, in general, is not beyond reproach. We find that Raiton's testimony was truthful.

Petitioner bases his characterization of Raiton's credibility on Raiton's criminal history and the terms of Raiton's second agreement with the Federal Government to be an informer. Raiton has been convicted for various crimes, including crimes involving mail fraud, crimes involving Raiton's confessed activity with respect to P-2-P, and crimes involving the distribution of cocaine. Moreover, he admitted before this Court that he at one time paid a witness to commit perjury and that he sold substantial assets, including a condominium and furniture, to Federal agents with whom he was cooperating.

The second agreement that Raiton signed, in which he agreed to continue to act as an informant and to testify for the Federal Government, set forth terms that were very favorable to Raiton. Those terms included a relatively short prison sentence (6.5 years to run concurrently with a 5-year prison term to which he had already been sentenced—only an additional 1.5 years in prison were to be served) for Raiton upon pleading guilty to criminal charges based upon his activities related to the distribution of P-2-P and methamphetamine, and promises by the Federal Government not to take any position on a request by, or on behalf of, Raiton for parole, not to object to any request by Raiton for a passport, and not to bring further criminal charges against Raiton based upon "Raiton's prior dealings in

cocaine, [P-2-P] and methamphetamine." According to petitioner, the latter two promises by the Federal Government would allow Raiton to gain access to and avoid forfeiting substantial sums of money, which Raiton admitted he had deposited in foreign bank accounts.

There are substantial countervailing factors, however, that lead us to conclude that Raiton testified truthfully as a witness before this Court. Those factors include the detail and consistency of Raiton's testimony. Much of Raiton's testimony did not even leave much room for prevarication, as it simply involved the translation of specific language contained in recording tape transcripts—the language itself made clear that the parties to conversations were trying to conceal the subject of their conversations. Finally, in large part, we base our finding that Raiton testified truthfully on our observation of his demeanor.

The third and final ground for petitioner's argument that respondent has not introduced sufficient evidence into the record to connect petitioner to the distribution of P-2-P, the activity from which respondent alleges petitioner received illegal income, is that Raiton's testimony and the recording tape transcripts that he interpreted do not sufficiently indicate that petitioner distributed P-2-P. We disagree.

Raiton testified that petitioner told him that petitioner distributed P-2-P, and Raiton also testified that petitioner bought large quantities of P-2-P from him during both 1980 and 1981. The method by which Raiton delivered P-2-P to petitioner was described by Raiton in great detail, and Raiton's translation of the recording tape transcripts provides us with extensive evidence of the method by which petitioner paid for his P-2-P during 1981, and of petitioner's attempt to negotiate more favorable terms of sale for P-2-P. The following is an example of Raiton's testimony translating a recording tape transcript (Exhibit 11(h)), and is evidence of the negotiations that transpired:

Q. Mr. Raiton, I now will show you Exhibit 11 (h) and I direct your attention to page 13 of 11 (h). Raymond Martorano said you flooded the area with cars. John Berkery said there is a lot of air pollution with all of these cars and you replied but the air has cleaned up now hasn't it and then Ronald Raiton, you said you told me it is clearing up. John Berkery then said I put the emission controls on. Can you explain this?

A. Yes, they were referring to the fact that I had sold too much P2P in the Philadelphia area and that everybody had P2P and as a result, their prices that they were getting were dropping.

Q. I now direct you to page 23 of that exhibit. John Berkery and you have this long paragraph where he was saying that would be just like Ford saying leave all these dealers and get Ford's wherever they can. Can you explain that?

A. Yes, Martorano had started to talk to me that I should give John Berkery the exclusive distribution of my P2P in the Philadelphia area and Berkery said you know, it is like if you were a Ford dealer, you only buy from Ford rather than just everybody could come and buy.

Based upon the foregoing and the record as a whole, for purposes of determining whether the presumption of correctness applies to respondent's determinations, we find that respondent has introduced sufficient evidence connecting petitioner with the distribution of P-2-P.

### (C) Summary

Since we have rejected petitioner's grounds for his argument that the presumption of correctness does not apply in these cases, respondent's determinations, as embodied in his statutory notices of deficiency to petitioner, are presumed correct.

### Deficiencies in and Additions to Taxes

Petitioner contends that if we find that Raiton's testimony establishes the necessary connection between petitioner and the distribution of P-2-P during 1980 and 1981, we should also find that his testimony establishes that petitioner's unreported income for 1980 was substantially less than the amount of such income determined by respondent. Petitioner bases that argument on Raiton's testimony that described petitioner's attempt to convince Raiton to lower his sales price to petitioner for P-2-P.

Raiton testified before this Court that in December 1980, petitioner had complained to Raiton that petitioner was required to reduce his sales price for P-2-P from $7,500 per gallon to $5,500 per gallon because too many people were selling P-2-P. Raiton's testimony, however, does not indicate the time at which petitioner reduced his sales price or the number of gallons sold at the lower price. The number of gallons of P-2-P sold at the lower price during 1980 therefore has not been established by petitioner. Moreover, there is not sufficient evidence in the record to justify an approximation, pursuant to the rule in *Cohan v. Commis-*

there is not sufficient evidence in the record to justify an approximation, pursuant to the rule in *Cohan v. Commissioner,* 39 F.2d 540, 543-544 (2d Cir. 1930), of the number of gallons of P-2-P sold at the lower price. We also note that it is possible that when petitioner talked to Raiton in December 1980, petitioner still was selling P-2-P at the higher price, but trying to negotiate a lower price per gallon from Raiton. Therefore, even if Raiton's testimony were sufficiently detailed to indicate the amount by which respondent's determination should be reduced, such testimony, without more, would not satisfy petitioner's burden in these cases.

Based on the foregoing, we hold that petitioner has not satisfied his burden of proof on this issue. See Rule 142(a), Tax Court Rules of Practice and Procedure.

In order to reflect the foregoing,

> *Appropriate orders and decisions will be entered.*