SIMON L. COOPER AND CASSIE COOPER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cooper v. Commissioner
Docket No. 18819-85.
United States Tax Court
T.C. Memo 1989-82; 1989 Tax Ct. Memo LEXIS 86; 56 T.C.M. (CCH) 1349; T.C.M. (RIA) 89082; February 27, 1989; As amended February 28, 1989 Michael E. Benchoff, *87 for the petitioners. Patricia Beary, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: Respondent determined deficiencies in petitioners' Federal income tax and additions to tax as follows: Additions to Tax
Taxable Year Ended
Deficiency
[1] Section 6653(b) December 31, 1978
$ 79,887.00 $ 39,944.00
December 31, 1979
$ 152,652.00
$ 76,326.00
After concessions, [2] the issues to be decided are: 1) whether respondent erred in his determination of petitioners' cost of goods sold for taxable years 1978 and 1979; 2) whether petitioners are liable for additions to tax for fraud under section 6653(b) for taxable years 1978 and 1979; and 3) whether petitioners are liable for self-employment tax in excess of the amount shown on their Federal income tax returns for taxable years 1978 and 1979. *88 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners Simon L. Cooper (hereinafter, when used in the singular form, "petitioner" refers to Simon Cooper) and Cassie Cooper resided in Phoenix, Arizona, when they filed their petition. Petitioners were husband and wife during the years at issue. Petitioner was engaged in the wholesale scrap metal business, doing business as Acme Salvage, a sole proprietorship, during 1978 and 1979. Petitioner, the son of a sharecropper, was born in Texas in 1904. He started working in the cotton fields at the age of six. He attended school for seven or eight years, with interruptions for spring planting and fall harvesting. Petitioner continued to work in the cotton fields until about 1950. Around 1952, petitioner began working as a laborer at Acme Salvage, and in approximately 1960, petitioner took over the business. Cassie Cooper was raised in Texas where she began working in the fields chopping cotton at the age of eight. Mrs. Cooper attended school through the eighth grade but had to leave school early *89 to work in the fields. Mrs. Cooper worked in the fields until she was approximately 36 years old. Between that time and 1962, when she married petitioner, Mrs. Cooper worked in a tamale factory, did janitorial work, washed dishes, and worked as a maid. Most of the sales of Acme Salvage for 1978 and 1979 were to National Metals Co. and Empire Metals, Inc. (hereinafter referred to as Empire). Acme Salvage employees drove trucks to National Metals Co. and Empire to deliver scrap metal. The metal was weighed in and the employees were given copies of weigh tickets. The weigh tickets showed how much metal had been delivered. Petitioner called National Metals Co. practically every morning to find out what price the company was paying for various metals so he would know how much to pay his suppliers for scrap metal. Every Friday, petitioner went to National Metals Co. and Empire to collect payment for the deliveries during the week. When petitioner was paid for the deliveries, he was given a copy of the purchase order. Michael Haskes of National Metals Co. paid petitioner for scrap metal in cash and by check. Petitioner would call National Metals Co. before going to pick up the *90 money to tell Mr. Haskes how much he wanted in cash and how much by check. Petitioner needed cash to run his business because his suppliers wanted payment in cash. Petitioner requested partial payment in cash from National Metals Co. to obtain cash needed for use in his business. Petitioner used substantially all of the cash he received from the sale of scrap metal to buy more scrap metal. The checks petitioner received from National Metals Co. and Empire were endorsed by either petitioner or Mrs. Cooper. Mrs. Cooper cashed some of the checks and deposited some of them in bank accounts. Mrs. Cooper kept approximately $ 200-$ 300 of the cash each week to pay household bills. Mrs. Cooper had a savings account but did not deposit any money from the National Metals Co. and Empire checks into that account. In 1978, petitioner sold 2,188,682 pounds of metal to National Metals Co. and Empire. Petitioner received a total of $ 386,371 in 1978 as a result of his sales to National Metals Co. Of the total sales to National Metals Co. during the year 1978, petitioner received $ 252,143 in cash and $ 134,228 in checks payable to Acme Salvage. As a result of his sales to Empire, petitioner *91 received a total of $ 16,474 in 1978. Of the total sales to Empire during 1978, petitioner received $ 2,481 in cash and $ 13,993 in checks payable to Acme Salvage. In 1979, petitioner sold 2,391,626 pounds of metal to National Metals Co. and Empire. Petitioner received a total of $ 469,571 as a result of his sales to National Metals Co. Of the total sales to National Metals Co. in 1979, petitioner received $ 319,009 in cash and $ 150,562 in checks payable to Acme Salvage. Petitioner received a total of $ 26,094 as a result of his sales to Empire in 1979. Petitioner received payment from Empire in 1979 by checks payable to Acme Salvage or to cash. The 1979 checks from Empire payable to cash were deposited to the account of Leroys Liquors. Petitioner handled the bookkeeping for Acme Salvage, with some help from Mrs. Cooper, who would record the dates and amounts of purchases on Fridays. Petitioner did not keep complete business records. Petitioner kept two records of purchases for 1978. The figures in one record matched the cost of goods sold reported on petitioners' 1978 tax return. The figures in the second record reflected a higher cost of goods sold and higher gross receipts *92 than were reported on petitioners' 1978 tax return. Petitioners' tax returns for 1978 and 1979 were filed using the cash method of accounting. The returns were prepared by Robert R. Morrill, or his employee. Petitioner gave Mr. Morrill his incomplete business records for 1978 and 1979 to use in preparing petitioners' 1978 and 1979 Federal income tax returns. Petitioner did not tell Mr. Morrill about any cash receipts for which there were no records. Petitioners' tax return for 1978 showed gross receipts of $ 149,195 and cost of goods sold of $ 115,888. Petitioners' tax return for 1979 showed gross receipts of $ 188,899 and cost of goods sold of $ 145,601. Petitioner purchased stolen copper during 1978 and 1979. On February 18, 1981, petitioner pled guilty to Count Twelve of a twelve-count indictment, whereby he admitted engaging in racketeering activities during the period of October 1978 through December 18, 1979, a Class 3 felony in the State of Arizona. Judgment with respect to the felony conviction was entered on September 28, 1981, in the Superior Court of the State of Arizona, Maricopa County. As a result of petitioner's conviction, he was required to pay and did *93 pay $ 33,600 to the State of Arizona. In addition, petitioner was required to divest himself of any interest in Acme Salvage. In his notice of deficiency dated March 22, 1985, respondent redetermined petitioners' taxable income for taxable years 1978 and 1979. For 1978, respondent increased petitioners' gross receipts by $ 262,051 for a total of $ 411,246, and increased petitioners' cost of goods sold by $ 34,850 for a total of $ 150,738. For 1979, respondent increased petitioners' gross receipts by $ 324,506 for a total of $ 513,405, and increased petitioners' cost of goods by $ 44,359 for a total of $ 189,960. OPINION The first issue for our consideration is whether respondent erred in his determination of petitioners' cost of goods sold for the years at issue. [3] Respondent determined that petitioners' cost of goods sold was $ 150,738 for 1978 and was $ 189,960 for 1979. Petitioners bear the burden of proving that respondent's determinations are incorrect. Rule 142(a). If petitioners can establish that some expenditures have been made, absolute certainty is not required and the Court may approximate the allowable expenditures "bearing heavily if it chooses upon the taxpayer *94 whose inexactitude is of his own making." Cohan v. Commissioner,39 F.2d 540, 543-544 (2d Cir. 1930). Respondent acknowledges that petitioner made payments to purchase scrap metal. However, respondent and petitioners disagree as to the amount of these purchases. Petitioners did not bring forward business records adequate to show the amount of the payments for scrap metal. However, the record in this case gives sufficient evidence for us to make an approximation of the amount of the payments. Substantially all of the cash petitioner received was used to purchase materials for resale from vendors who required cash. Petitioner testified that he made a profit of between one and ten cents a pound on copper and other metals excluding aluminum and steel with an average profit of five cents a pound. Petitioner also testified that he made an average profit of ten cents a pound on aluminum and an average profit of ten dollars a ton on steel. We closely observed both petitioners during their testimony. Notwithstanding other factors *95 which tend to denigrate their credibility, we find petitioners to be forthright and determine them to be credible witnesses. Furthermore, petitioner's testimony regarding his amount of profit is uncontradicted by any evidence in the record and is partially corroborated by the testimony of a reliable, unbiased witness. Petitioner's profit estimate for his copper sales is corroborated by the testimony of Michael Cassatt, an investigator for the Arizona Department of Public Safety Internal Affairs Unit, who investigated petitioner's purchases of stolen copper. Mr. Cassatt testified that petitioner's profit on copper was approximately one to ten cents per pound. Although petitioner's business acumen disparages somewhat his profit estimates, we find it credible that he remembers the approximate profit per pound he made on his sales of scrap metal. Although petitioner did not keep track of his yearly gross receipts or cost of goods sold, he did call National Metals Co. on a regular basis to find out the price the company was paying for scrap metal so he would know how much to pay his suppliers. Since petitioner was aware of his purchase price and his selling price, we believe that he *96 would have known the approximate profit per pound he made on his resale of scrap metal. Nevertheless, since petitioners, by their failure to produce adequate records, created the need for an approximation, we will bear heavily against petitioners in our approximation as is allowed by Cohan v. Commissioner, supra. Accordingly, we will calculate gross profit using petitioner's highest profit estimate (ten cents per pound) for all of the metal he sold to National Metals Co. and Empire. In 1978, petitioner sold 2,188,682 pounds of metal to National Metals Co. and Empire. Pounds sold
2,188,682
Price per pound
x .10
Gross profit $ 218,868  We will approximate petitioners' cost of goods sold by reducing petitioners' sales to National Metals Co. and Empire by the amount of their gross profit on these sales. 1978
Sales
$ 402,845 Gross profit
< 218,868>
Cost of goods sold $ 183,977 In 1979, petitioner sold 2,391,626 pounds of metal to National Metals Co. and Empire. 1979
Pounds sold
2,391,626
Price per pound
x .10
Gross profit $ 239,163  Again, we will approximate *97 petitioners' cost of goods sold by reducing petitioners' sales to National Metals Co. and Empire by the amount of their gross profit on these sales. 1979
Sales
$ 495,665 Gross profit
< 239,163>
Cost of goods sold $ 256,502 We hold that respondent erred in his determination of cost of goods sold for 1978 and 1979. We find that the cost of goods sold for 1978 is $ 183,977 and that the cost of goods sold for 1979 is $ 256,502. The second issue for our consideration is whether petitioners are liable for additions to tax for fraud under section 6653(b) for 1978 and 1979. Respondent takes the position that petitioners' underpayment of income tax for the taxable years 1978 and 1979 is due to fraud. Section 6653(b) [4] provides an addition to tax of 50 percent of the amount of a tax deficiency if any part of the underpayment is due to fraud. To sustain a fraud determination under section 6653(b), respondent has the burden of proving by clear and convincing evidence (1) that there was an underpayment of tax and (2) that some portion of the underpayment was due to fraud. Sec. 7454(a); Rule 142(b); Hebrank v. Commissioner,81 T.C. 640, 642 (1933). *98 We have determined that petitioners' cost of goods sold is $ 183,977 for 1978 and $ 256,502 for 1979. The cost of goods sold shown on petitioners' Federal income tax returns is $ 115,888 for 1978 and $ 145,601 for 1979. Therefore, petitioners have increased cost of goods sold of $ 68,089 for 1978 and $ 110,901 for 1979. However, petitioners conceded that they failed to report gross receipts of $ 258,659 for 1978 and $ 323,052 for 1979. For 1978, unreported gross receipts exceed the additional cost of goods sold we have determined petitioners are entitled to by $ 190,570. For 1979, unreported gross receipts exceed the additional cost of goods sold by $ 212,151. Since petitioners have not demonstrated that they are entitled to any other deductions not allowed by respondent, petitioners have a taxable income of $ 190,570 more than shown on their return in 1978 and $ 212,151 more than shown on their *99 return in 1979. As a result of this increased taxable income, petitioners owe additional income tax for 1978 and 1979. Therefore, respondent has met his burden of proving that there was an underpayment of tax. To establish the second element under section 6653(b), respondent must demonstrate by clear and convincing evidence that the taxpayer had a specific intent to evade a tax due and owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Webb v. Commissioner,394 F.2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Stringer v. Commissioner,84 T.C. 693, 713 (1985), affd. without published opinion 789 F.2d 917 (4th Cir. 1986). Fraud must never be presumed or decided on the basis of suspicion. Beaver v. Commissioner,55 T.C. 85, 92 (1970); Thurston v. Commissioner,28 T.C. 350, 355 (1957). Nonetheless, fraud need not be established by direct evidence, but may be established from all relevant facts and circumstances. *100 Kotmair v. Commissioner,86 T.C. 1253, 1260 (1986); Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). The sophistication of the taxpayer is also relevant to a determination of fraud. Halle v. Commissioner,175 F.2d 500, 503 (2d Cir. 1949). After an examination of the entire record in this case, we conclude that respondent has not successfully carried his burden of proof. Respondent argues that petitioners' failure to report income in 1978 and 1979 indicates that petitioners had a fraudulent intent. We do not consider two years' understatement of taxable income to be conclusive of fraud in the context of the factual circumstances before us. An understatement of income does make a return erroneous. Absent a showing of an intent to evade a tax due, however, such understatement does not of itself make a return fraudulent. Respondent *101 contends that petitioners' "business acumen and conduct reflect sophistication and literacy." We consider respondent's contention to be an utter distortion of the facts in the record. Both petitioners had limited education. Petitioners had no experience running a business prior to their ownership of Acme Salvage. The description in the record of the operation of Acme Salvage indicates that no extensive business knowledge was required to run the business. Petitioners' poor record keeping reflects their lack of business sophistication. Mrs. Cooper testified that she was never aware that she or her husband should have paid more tax. Petitioner testified that he thought that because he used the cash he received to buy more scrap metal, he did not have to report the cash as income. At trial, respondent asked petitioner, "Did you have intention of avoiding the payment of tax?" Petitioner replied, "Not at all. Not at all. I thought I was -- when I was using the money and turning it right back in there that I was doing the right thing. I found out later I wasn't." The truth of petitioner's simple declaration shines like a beacon through the fog of respondent's attempts to obscure *102 it. As Daniel Webster declared, "There is nothing so powerful as truth, and often nothing so strange." [5] We closely observed petitioners' demeanor and found both petitioners to be very credible witnesses. We believe that Mrs. Cooper was testifying truthfully when she said that she was unaware that she and her husband owed more taxes. We also believe that petitioner was testifying truthfully when he said that he had no intent to avoid payment of income taxes. Respondent asserts that petitioners' arrangement to be paid in cash, the cashing of certain checks at a local liquor store, and the fact that cash receipts were not deposited into bank accounts are all badges of fraud. Again, under the circumstances of this case, we cannot agree. Although cash transactions are suspect, [6] due to the peculiar nature of petitioner's business, we see nothing surreptitious in petitioner's dealing largely in cash. Petitioner needed cash to pay his suppliers, who required cash payments. National Metals Co. and Empire agreed to pay petitioner in cash, apparently *103 with the understanding that petitioner needed cash to obtain scrap metal to resell to them. Under the circumstances of petitioner's business exigencies, we find that petitioner has provided an adequate explanation for his desire to be paid in cash and his failure to deposit cash payments in a bank account. Respondent has failed to come forward with evidence which sufficiently places this explanation in doubt. Furthermore, the fact that checks made to cash were deposited to the account of Leroy's Liquors does not mean that the cash did not reach petitioners. We understand that such was the case. Respondent has not introduced any evidence to show that petitioners deposited checks payable to cash in the account of Leroy's Liquors in order to conceal income. Respondent also contends that petitioners' failure to maintain adequate books and records, petitioners' failure to tell their accountant about their receipt of cash payments, and petitioner's felony *104 conviction are evidence of fraud. In the usual case, such indicia would constitute a premise for a finding of fraud. However, we have considered this evidence and do not find that it tips the scale toward a determination that petitioners' underpayment is due to fraud under the unusual circumstances of this case. We are convinced that petitioners' failure to keep adequate books and failure to give complete information to their accountant resulted from ignorance, misunderstanding, and lack of knowledge, not from an intent to evade tax. Petitioners' poor records can be attributed to petitioners' meager understanding of business practices. Furthermore, a criminal conviction does not necessarily preclude credibility. [7] While petitioner's felony conviction is relevant to the issue of petitioner's credibility, our close observation of petitioner's demeanor convinces us that petitioner is a very credible witness. The issue before us is clearly distinct from that before the Arizona court in petitioner's criminal case. In the context of the case before us, we will not allow the justice done by the Arizona court to create an injustice by discrediting petitioner's testimony in this court. *105 We are not convinced on the facts before us that petitioner's purchases of stolen copper demonstrate an intent to evade tax. Respondent has not shown that petitioners carried on a life style or had assets consistent with the cost of goods sold figure determined by respondent. Respondent's witness, Gary Elias, an appeals auditor for the Internal Revenue Service, testified that he found no substantial assets in his examination of the assets of petitioners. The evidence in the record indicates that petitioners' assets (other than business assets) consisted primarily of a modest home purchased by Mrs. Cooper before her marriage to petitioner and a car petitioners bought before the years at issue. No evidence in the record suggests that any of the cash obtained by petitioners from National Metals Co. and Empire was used for indulgent expenditures or to build up personal assets. Respondent has offered no explanation for his inability to produce evidence linking petitioners to assets or expenditures *106 that would be expected if petitioners had fraudulently underreported income as respondent claims. Having carefully considered respondent's arguments and the evidence in this case, we hold that he has failed to carry his burden of proof by clear and convincing evidence. Accordingly, we do not sustain the additions to tax for fraud under section 6653(b). The final issue for our consideration is whether petitioners are liable for additional self-employment tax for taxable years 1978 and 1979. Section 1401 provides for a tax on the self-employment income of every individual. "Self-employment income" is defined generally as "the gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowable by this subtitle which are attributable to such trade or business." Secs. 1402(a); 1402(b). The amount of self-employment income subject to the tax is limited to $ 17,700 in 1978 and $ 22,900 in 1979. Sec. 1402(b). Petitioners bear the burden of proving that they are not liable for self-employment tax. Welch v. Helvering,290 U.S. 111, 115; Rule 142(a). Petitioner operated Acme Salvage as a sole proprietor dealing *107 in scrap metals. Consequently, petitioner was self employed. Petitioner has failed to prove that his self-employment income was less than $ 17,700 in 1978 or less than $ 22,900 in 1979. Accordingly, we sustain respondent's determination as to the additional self-employment tax liability for each of the years at issue. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise stated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years here at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Petitioners conceded the defense of the statute of limitations for taxable years 1978 and 1979. Petitioners also conceded that they failed to report gross receipts of $ 258,659 for taxable year 1978 and $ 323,052 for taxable year 1979. Respondent conceded $ 3,392 in adjustments to gross receipts for taxable year 1978 and $ 1,454 in adjustments to gross receipts in taxable year 1979.↩
3. The cost of goods purchased for resale is deducted from gross sales in computing gross income. Sec. 1.162-1(a), Income Tax Regs.↩
4. Sec. 6653(b) provided, in pertinent part, as follows: (b) Fraud. -- If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment.↩
5. Daniel Webster, Argument in the murder of Captain White, quoted in The Home Book of American Quotations 422 (B. Bohle ed. 1967).↩
6. For example, in Malicki v. Commissioner,T.C. Memo. 1988-559, 56 T.C.M. 814, 823; 93 P.H. 88↩-2893, 88-2903, we stated that "this Court must view cash transactions with a close scrutiny and much skepticism."
7. For example, in Berkery v. Commissioner,91 T.C. 179↩ (1988), we found a witness to be credible even though he had been convicted of mail fraud and drug related crimes.