MICHAEL J. MALICKI AND KATHLEEN MALICKI, [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; GOLD EMPORIUM, INC., Petitioner v. COMISSIONER OF INTERNAL REVENUE, Respondent Malicki v. Commissioner
Docket Nos. 25157-84, 888-85.
United States Tax Court
T.C. Memo 1988-559; 1988 Tax Ct. Memo LEXIS 588; 56 T.C.M. (CCH) 814; T.C.M. (RIA) 88559; December 8, 1988; As amended December 12, 1988 Robert E. Dallman and John A. Sikora, for the petitioners. James M. Klein, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: Respondent determined deficiencies and additions to tax in petitioners' Federal income taxes as follows: Michael J. and Kathleen Malicki
Addition to Tax
Year
Deficiency
Section 6653(b) [2]
1980
$ 445,572.82
$ 222,786.41 *
Gold Emporium, Inc.
Addition to Tax
Year
Deficiency
Section 6653(b)
1980
$ 271,174.00
$ 135,587.00
1981
1,720.00
860.00
After concessions, see infra, the issues for determination are: 1. Whether petitioner Gold Emporium, Inc. had *590 unreported income for the years in issue in the amount determined by respondent. 2. Whether petitioner Michael Malicki diverted to his personal use unreported income from petitioner Gold Emporium, Inc. and, therefore, received a constructive dividend of this diverted income. 3. Whether petitioner Gold Emporium, Inc. is liable for the addition to tax under section 6653(b). 4. Whether petitioner Michael Malicki is liable for the addition to tax under section 6653(b). FINDINGS OF FACT Some of the facts are stipulated and are found accordingly. The stipulation of facts, supplemental stipulation of facts, and attached exhibits are incorporated herein by this reference. Petitioners Malicki (hereinafter sometimes collectively referred to as "the Malickis") resided in Slinger, Wisconsin, when they filed their petition in this case. Petitioner Gold Emporium, Inc., (hereinafter sometimes referred to as "Gold Emporium" or "the store"), a Wisconsin corporation, maintained its principal place of business in Slinger, Wisconsin, when it filed its petition in this case. Petitioner-husband (hereinafter sometimes referred to as "Malicki") was the president and sole shareholder *591 of Gold Emporium during the years in issue. Background
Malicki is a high school graduate with little or no accounting training. He opened the store in 1975 or 1976. Gold Emporium was incorporated on December 6, 1978. For Federal income tax purposes, the store uses a fiscal year ending September 30 and the accrual method of accounting. During the years in issue the storefront was located in Wauwatosa, Wisconsin, a section of Milwaukee, Wisconsin. During the years in issue, Gold Emporium was engaged in the business of purchasing and selling precious metals, watches, coins, jewelry, and gems. It purchased coins, scrap gold (in the form of rings, chains, or other scrap), scrap silver, and other precious metals primarily from the public and sold these items to the public as well as to coin dealers and metal dealers throughout the country. Gold Emporium conducted much of its business in cash. The store used purchase receipt books to record when an employee made a purchase from a customer. Each book contained fifty receipts, consisting of an original and one copy, numbered one through fifty. According to Malicki, every time the store paid a customer for a purchase, *592 a store employee prepared a purchase receipt. Malicki stated that the customer was offered one copy of the purchase receipt and the store retained the other. Purchase receipts were used for cash transactions only; purchase receipts generally were not prepared, or were marked "void," when a Gold Emporium check was given to the seller. Most of the purchase receipts introduced as evidence in this case are undated; many of these purchase receipts contain no description of the item or items purchased; a few of the purchase receipts do not show the name of the customer from whom Gold Emporium purchased the items. Each purchase receipt book covered a certain calendar day or a number of days. The store employees tallied each completed book in order to compute the amount of purchases made for the period covered by the book. They then wrote the total cash purchases reflected in the book on its front cover. The date or dates covered by the book also was written on the cover. Periodically the completed purchase receipt books were transmitted to Gold Emporium's accountant, Michael Lanko (hereinafter sometimes referred to as "Lanko"), for recordation in the store's ledger book which *593 Lanko maintained. The record does not show the amount of scrap metal Gold Emporium purchased from its customers during the years in issue. Gold Emporium's Federal corporate income tax returns for its fiscal years ending September 30, 1980, and September 30, 1981, reflected merchandise bought for manufacture or sale of $ 3,880,046.28 and $ 1,001,339.51, respectively. For its fiscal year ending September 30, 1980, Gold Emporium disbursed by check $ 1,328,567.07 for purchases, including among others, $ 672,149.15 to Dick Walters; [3] $ 48,170 to Rose Mary Walters; $ 147,000 to Blunt, Ellis and Loewi; $ 19,074.48 to Fox Valley Coin; $ 20,200 to Glass Cupboard; $ 21,300 to Mike & Pat Lanko; $ 21,300 to Richard Glaser; and $ 14,000 to Dan Stevens. For some part of the years in issue Gold Emporium employed at least one, and at times *594 two, local police officers in the store during all of its open hours. Malicki stated that the Wauwatosa Police Department also maintained a book at the store wherein these police officers recorded information regarding purchases made by Gold Emporium. This book was not made a part of the record in this case. Gold Emporium's employees prepared sales invoices upon receiving money as a result of making sales to the store's customers. Malicki stated that the store kept one copy of the sales invoice and the customer received a copy if the customer wanted one. Some of the sales invoices introduced as evidence in this case contain no description of the items sold and/or the name of the customer to whom Gold Emporium sold the items. At the end of the day, or every few days, on the back of scratch paper (usually the back of an old calendar page), Gold Emporium's employees summed the proceeds shown on the sales invoices. The scratch paper became a type of "informal bank deposit slip." This informal deposit slip showed sales to customers paid by cash, check, or charge card. Only a very few sales were charge transactions. The proceeds then were deposited into the corporate checking *595 account. The sales invoices pertaining to the deposit were stapled to the informal bank deposit slip. Lanko recorded sales in Gold Emporium's ledger on the basis of deposits to the corporate checking account, the sales invoices, and the informal deposit slips. Other than through a review of the bank statements for the store's checking account, Lanko had no system for detecting if receipts were unreported. For those transactions where payment was not received at the same time as the sale itself, Malicki made a notation of the amount due, generally on a small slip of paper. When payment subsequently was received, Malicki discarded the slip of paper. Malicki never informed Lanko about any accounts receivable due Gold Emporium as a result of these delayed payment transactions. Gold Emporium's Federal corporate income tax returns for its fiscal years ending September 30, 1980, and September 30, 1981, reflected gross receipts or sales of $ 4,355,351.46 and $ 1,707,332.73, respectively. Lanko relied on the corporate ledger, sales invoices, cancelled checks, bank statements, and purchase receipt books to prepare Gold Emporium's Federal corporate income tax returns for the fiscal *596 years ending September 30, 1980, and September 30, 1981. Gold Emporium sold coins and/or scrap metal, including scrap gold and/or silver, during the years in issue to a number of entities, including Pease & Curren Incorporated (hereinafter sometimes referred to as "Pease & Curren" or "the refinery"); Avon Metal Services, Ltd. (hereinafter sometimes referred to as "Avon Metal"); Fox Valley Coin and Gun Exchange (hereinafter sometimes referred to as "Fox Valley Coin"); F. J. Vollmer & Co.; Pioneer Mint; Republic Precious Metals; and United Precious Metals. The Pease & Curren Transactions
Pease & Curren, located in Warwick, Rhode Island, is a refiner of precious metals. At various times in the years in issue, Gold Emporium mailed to Pease & Curren scrap metal which the store had accumulated through purchases. Pease & Curren paid Gold Emporium approximately ninety-eight percent of the fair market value of the precious metals contained in the scrap metal Gold Emporium mailed to the refinery. Pease & Curren paid Gold Emporium, either by check or one ounce rectangular gold bars known as Suisse credits, for the value of the precious metals one month or longer after the refinery *597 received the shipment from the store. However, from mid-January 1980 through October 1980, Pease & Curren paid Gold Emporium eight to ten weeks, usually, eight weeks, after shipment. Gold Emporium included all checks received from Pease & Curren on sales invoices and informal bank deposit slips and deposited the checks into the store's checking account. All deposits to Gold Emporium's checking account of sales proceeds paid by check and received from the refinery for the taxable year ending September 30, 1980, were included in gross receipts and reported on Gold Emporium's Federal income tax return for that period. In addition to checks from Pease & Curren, for the taxable year ending September 30, 1980, Gold Emporium received Suisse credits from the refinery in the following amounts and values: Number of one-ounce
Date
gold bars received
Value
May 8, 1980
25
$ 12,556.25
May 15, 1980
55
27,573.45
September 23, 1980
16
10,768.00
Total
96
$ 50,897.70
No sales invoices or purchase receipts were prepared by the store's employees to reflect receipt by Gold Emporium of the Suisse credits from the refinery. Gold Emporium did not deposit *598 the Suisse credits into its checking account or treat as a taxable event its receipt of the Suisse credits from Pease & Curren. It was easier for Gold Emporium to sell Krugerrands [4] to the public than Suisse credits because more of the store's customers knew about Krugerrands. Customers who knew what Suisse credits were, however, would accept them just as readily as they would accept Krugerrands. Krugerrands sometimes are called "K-rands," "Kus," or "gold coins." Suisse credits sometimes are referred to as "S-K" or "gold coins." Malicki used the terms ,"gold," "coins," "gold coins," or "gold bullion" to refer to Krugerrands or Suisse credits. Malicki also used the terms "coins" or "gold coins" to refer to other gold coins, such as some collector's coins. During the Spring and Summer of 1980, before the end of July 1980, Fox Valley Coin traded with Gold Emporium between 20 and 50 Krugerrands for an even number of Suisse credits. Neither Gold Emporium nor Fox Valley Coin made *599 any recordation of these transactions. Gold Emporium also may have traded Suisse credits for Krugerrands with other individuals or entities. Gold Emporium did not treat its exchange of Suisse credits for Krugerrands as a taxable transaction. Gold Emporium did not maintain any records showing exchanges of Suisse credits for Krugerrands. Gold Emporium sold nine Suisse credits to Fox Valley Coin in June 1980. A Gold Emporium store employee prepared a sales invoice to reflect this sale to Fox Valley Coin, and Fox Valley Coin's check for this purchase was deposited into the store's checking account on June 20, 1980. Gold Emporium sold three Suisse credits and twelve Krugerrands to Kathleen Russo on May 15, 1980. Gold Emporium made other sales of gold coins, including Krugerrands, Suisse credits, and collector's coins, in the fiscal years ending September 30, 1980, and September 30, 1981. The store also purchased gold coins, including Krugerrands, collector's coins, and possibly Suisse credits, during the years in issue. Gold Emporium takes a physical inventory at the end of its fiscal year to determine its ending inventory, reported at cost. The ending inventory reflected *600 on the store's Federal corporate income tax return for its fiscal year ending September 30, 1980, was $ 346,547.65. The wholesale value of sixteen one-ounce gold bars was included in this ending inventory for September 30, 1980. According to Malicki, these sixteen one-ounce gold bars were Suisse credits. It is not possible from the record in this case to determine whether any of the sixteen one-ounce gold bars reflected in ending inventory for September 30, 1980, were part of the ninety-six Suisse credits Gold Emporium received from Pease & Curren during that fiscal year. The ending inventory reflected on Gold Emporium's Federal income tax return for its fiscal year ending September 30, 1981, was $ 112,490.00. The wholesale value of twelve Krugerrands was included in this ending inventory. It is not possible from the record in this case to determine whether any of the twelve Krugerrands reflected in ending inventory for September 30, 1981, were obtained as a result of exchanges of the Suisse credits Gold Emporium received from Pease & Curren in the fiscal year ended September 30, 1980. Gold Emporium concedes that the fair market value of the ninety-six Suisse credits which *601 it acquired from Pease & Curren in its fiscal year ending September 30, 1980, should have been reported upon receipt as additional gross receipts. It is not possible from the record in this case to determine whether Gold Emporium sold or exchanged any of these particular ninety-six Suisse credits. The Disputed Avon Metal Transactions
Gold Emporium's Federal income tax returns for the years in issue were examined by respondent as part of a gold/silver project wherein respondent analyzed the records of thirty-seven coin dealers located in the State of Wisconsin. In connection with this project, respondent prepared a computerized printout (hereinafter sometimes referred to as "the printout") which listed, among other things, purported sales by Gold Emporium to the other dealers included in the project. Avon Metal was another of the dealers whose records were analyzed as part of this gold/silver project. Gold Emporium sold scrap metal during the years in issue to Avon Metal. Irwin Bard (hereinafter sometimes referred to as "Bard") was an officer and sole shareholder of Avon Metal. Bard operated Avon Metal out of an office located in his personal residence. Avon Metal's *602 only employees were Bard and his spouse. Bard graduated from law school in 1964 or 1965. He has been in the precious metal business since 1965 or 1966. Bard started Avon Metal in 1976. In 1979 and 1980, Avon Metal was primarily in the business of purchasing scrap precious metals (i.e., gold, silver, platinum, and paladium) and reselling it to a refinery in Chicago, Illinois (hereinafter sometimes referred to as "the Chicago refinery"). Scrap gold constituted the bulk of Avon Metal's business. Avon Metal paid approximately ninety-one or ninety-two percent of the market value of the gold in the scrap metal it purchased. It resold the gold to the Chicago refinery for ninety-eight percent of its market value. According to Bard, in late January and February of 1980, because of the large amount of available gold, the Chicago refinery discounted purchases of pure gold by five to ten dollars per ounce; Avon Metal then discounted cash purchases from its customers in the same amount. Approximately ninety-five percent of Avon Metal's purchases were by cash. According to Bard, his procedures for purchases varied for mail customers, out-of-town-in-person customers, and in-town-in-person *603 customers. For customers whom he saw in person, Bard kept a daily log which he used to record his cash purchases and a telephone log which he used to record data pertaining to his telephone conversations, including, possibly, the date the purchase was to occur, the amount of scrap metal to be purchased, and the price on which the parties had agreed. The daily log and the telephone log were in three-ring binders on removable, loose-leaf pages. According to Bard, on the days he made a cash purchase he made a notation in his daily log to record the purchase. Bard stated that his telephone log would not necessarily contain references to all of his cash purchases since he sometimes made arrangements to pick up merchandise at a later date while at the customer's place of business or he sometimes stopped at a customer's place of business without making prior arrangements to stop. According to Bard, for in-person transactions, he did not write an invoice evidencing the purchase. Bard stated that, for in-town-in-person purchases, he did not give the customer any recordation of the weight of the scrap metal purchased or the amount he paid for the scrap metal. In the course of Avon Metal's *604 business, Bard issued numerous Avon Metal checks payable to cash. The cash was used to purchase gold from Avon Metal's customers. For in-person transactions, Bard usually paid for the purchases on the day of the transaction; however, for a period from approximately mid-January 1980 through mid-April 1980, he delayed payments for up to eight weeks. [5] Bard said he did not retain any records regarding the delayed payment transactions other than his telephone log and daily log; any memorandum regarding the amount due a customer on a delayed payment transaction was kept by the customer but the memorandum was torn up after Bard paid the customer. Any notation Bard made of the amounts he owed on the delayed payment transactions also was torn up when he paid the customer. During the examination of Gold Emporium's Federal corporate income tax returns for the years in issue, as part of respondent's gold/silver project, and through its use of *605 the printout, respondent determined that Avon Metal made the following cash purchases from Gold Emporium which were not included in deposits to Gold Emporium's corporate checking account or in the store's gross receipts for that period: Date
Amount
January 7, 1980
$   3,007.00
January 28, 1980
29,850.12 January 29, 1980
60,393.00
March 6, 1980
5,325.00
March 31, 1980
26,151.00
April 17, 1980
20,473.00
April 30, 1980
32,873.55
June 10, 1980
[6] 19,169.00
December 30, 1980
4,300.00
Total
$ 201,541.67
Except for two transactions, all transactions between Gold Emporium and Avon Metal were cash transactions. Gold Emporium's sales invoices show the following sales, or possible sales, to Avon Metal from October 1979 through December 1980: [7]
Date
Amount
October 2, 1979
$ 17,666.62
October 9, 1979
11,000.00
October 11, 1979
1,952.00
October 15, 1979
10,284.00
October 16, 1979
1,995.05
October 16, 1979
9,677.00
October 25, 1979
9,360.00
November 1, 1979
4,251.00
November 9, 1979
12,596.00
November 16, 1979
600.00
June 10, 1980
9,500.00
December 5, 1980
3,810.61
December 29, 1980
2,374.36
*606 Gold Emporium denies that the disputed transactions occurred, except for a purchase of $ 9,500 made on June 10, 1980, see note 6, supra. Malicki placed calls to Avon Metal during this period. Malicki and Bard contradict each other as to the purpose of these calls. During the examination of Gold Emporium's tax returns, at a meeting with the revenue agent who examined the returns, Lanko, and Malicki, Malicki said that there was a possible one-month delay in receiving payment from Avon Metal for these disputed transactions but he did not admit that the purchases occurred. Malicki did not deny at that time that Gold Emporium was dealing *607 with Avon Metal during this period. At this same meeting, the revenue agent and Lanko were able to trace all other sales by Gold Emporium included on the printout. During the years in issue, when the price of gold was high, Malicki had a lot of gold coming in. An unusually high volume of business relating to the purchase or sale of gold occurred in the early months of 1980, especially in January of that year. Again, Malicki and Bard took inconsistent positions as to transactions between Gold Emporium and Avon Metal during this period. The Notices of Deficiency
As a result of respondent's examination of Gold Emporium's Federal corporate income tax return for the years ending September 30, 1980, and September 30, 1981, respondent determined that Gold Emporium had underreported its gross receipts in the amounts shown from the following sources: Amount and Year
Source
9/30/80
9/30/81
Total
Avon Metal
$ 197,242
$ 4,300
$ 201,542
Pease & Curren
[8] 52,705
-0-  52,705
Blunt, Ellis and Loewi
339,562
-0-  339,562
Total
$ 589,509
$ 4,300
$ 593,809
*608 Respondent also determined that all or part of the underpayment of tax shown on Gold Emporium's Federal corporate income tax returns for the years in issue was due to fraud. Consequently, respondent determined that, pursuant to section 6653(b), Gold Emporium was liable for an addition to tax of fifty percent of the underpayment. As a result of respondent's examination of the Malickis' Federal individual income tax return for the year ending December 31, 1980, respondent determined that the Malickis had additional income in the amounts shown from the following sources: Source
Amount
Avon Metal
$ 201,542
Pease & Curren
[9] 52,705
Blunt, Ellis and Loewi
339,562
Total
$ 593,809
Respondent further determined that the correct amount of the Malickis' distributive share of a partnership loss reported on this tax return was $ 29,406, not the $ 120,317 claimed. [10]
*609 Respondent also determined that all or part of the underpayment of tax shown on the Malickis' Federal individual income tax return was due to the fraud of Malicki. Consequently, respondent determined that, pursuant to section 6653(b), Malicki was liable for an addition to tax of fifty percent of the underpayment. Respondent concedes that petitioners did not receive any unreported income resulting from transactions of Gold Emporium through commodity trading accounts with the brokerage firm of Blunt, Ellis and Loewi during the years in issue. The Malickis concede that in the year 1980 they received income in the form of capital gains in the amount of $ 12,336.50 from trading in commodities, which gain was not reported on their Federal individual income tax return for that year. The Malickis also agree that they received income from the sale of stock in the amount of $ 1,735.49 during 1980 which income was not reported on their Federal individual income tax return for that year. For 1980, the Malickis also incurred a long-term capital loss of $ 1,734.29 from the sale of stock which loss was not reported on their Federal individual income tax return for that year. Additional *610 facts
On the Federal individual income tax return they filed for 1980, the Malickis reported taxable income from the following sources: Source
Amount
Wages, salaries, tips, etc.
$ 304,000.00 Interest income
7,275.73 Dividends
405.00 Refunds of State and local income taxes
4,374.42 Capital gain
653.06 Pensions, annuities, rents, royalties,
partnerships, etc.
(157,204.41)
Other income -- land rental
3,000.00 Total taxable income
$ 162,503.80 On this 1980 tax return, the Malickis reported a total tax liability of $ 46,387.82. The Malickis deposited a total of $ 577,054.23 into their individual checking and savings accounts in 1980. Of these total deposits, $ 552,700.63 can be traced directly to reported taxable and non-taxable receipts. Of the remaining $ 24,353.60 in total deposits, $ 12,336.50 is attributed to unreported capital gains the Malickis realized in 1980 from trading in commodities, see supra; $ 1,717 is attributed to unreported taxable interest the Malickis received in 1980 when they sold certain United States Treasury bills; and $ 10,300 cannot be traced to any specific transaction or transactions. *611 Sometime in 1980 the Malickis misplaced the savings account passbook which they said identified deposits of the proceeds from the sale of the commodities and the sale of the Treasury bills discussed above. In August 1980, their bank opened a new savings account for the Malickis and transferred to this account the funds in the account with the missing passbook. The Malickis found the misplaced passbook sometime before the trial in the instant case. The "found" passbook shows a $ 1,717.10 deposit made on March 15, 1980, with a notation "Int on T Bill." This passbook also shows a $ 19,686.50 deposit [11] made on January 17, 1980, but with no notation identifying its source. Lanko prepared the Malickis' Federal individual income tax return for 1980. The Malickis did not tell Lanko about the sale of the commodities or Treasury bills when he prepared their 1980 tax return. Lanko met personally with the Malickis to obtain the information needed to prepare their 1980 Federal individual income tax return. *612 Lanko did not ask to see the Malickis' personal bank savings account passbooks nor did the Malickis' show him the passbooks. The Malickis reported $ 400 in dividend income from Gold Emporium on their 1980 Federal individual income tax return. Gold Emporium reported taxable income of $ 133,094.87 and $ 85,675.26 on its Federal corporate income tax returns for its fiscal years ending September 30, 1980, and September 31, 1981, respectively. Gold Emporium reported retained earnings of $ 147,279.76 and $ 209,217.72 on its Federal corporate income tax returns for its fiscal years ending September 30, 1980, and September 30, 1981, respectively. During the years in issue the Malicki rented two safe deposit boxes at the same bank. Entries to these boxes during this period were as follows: Entrant (Michael "M"
Date of Entry
Box
or Kathleen "K")
03/14/80
345
M
04/25/80
345
M
05/07/80
345
K
05/08/80
345
K
05/28/80
345
K
06/14/80
345
M
06/18/80
514
K
06/19/80
514
K
07/23/80
514
K
07/29/80
345
M
07/29/80
514
M
08/27/80
514
M
09/02/80
514
K
10/10/80
345
M
10/10/80
514
M
10/19/80
514
M
10/31/80
345
M
12/19/80
345
M
*613 Respondent conducted a criminal investigation of Malicki in 1984. Respondent discontinued the investigation also in 1984 without bringing criminal charges against Malicki. During the examination of Gold Emporium's Federal corporate income tax return, Lanko gave respondent records of Gold Emporium relating to the fiscal years ending September 30, 1980, and September 30, 1981. Respondent lost some of the records for the fiscal year ending September 30, 1981. Petitioners cooperated with respondent in the course of the examination of their Federal income tax returns. Sometime in 1981 or 1982, Malicki sold the store [12] to his brother-in-law, Dick Walters (hereinafter sometimes referred to as "Walters"). Malicki, however, continued his business under the name of Gold Emporium, Inc., apparently in a different location. Walters continued to operate the storefront under the Gold Emporium name. OPINION As a general rule, *614 respondent's deficiency determination is presumed to be correct. To prevail, petitioners must prove respondent is incorrect by the preponderance of the credible evidence. Traficant v. Commissioner,89 T.C. 501, 522 (1987); Bixby v. Commissioner,58 T.C. 757, 776-777 (1972). In other words, petitioners have the burden of proving for the years in dispute that, more likely than not, Gold Emporium included in gross income the receipts from the sale of the Suisse credits the store received from Pease & Curren (or Krugerrands exchanged for the Suisse credits) and Gold Emporium did not receive the disputed payments from Avon Metal. The Pease and Curren Transactions
Petitioners concede that the fair market value of the ninety-six Suisse credits the store received from Pease and Curren should have been included in Gold Emporium's gross receipts for its fiscal year ending September 30, 1980. Petitioners argue, however, that there was no underreporting of gross receipts on this issue on a cumulative basis because Gold Emporium subsequently sold these Suisse credits (or Krugerrands exchanged for the *615 Suisse credits) and included the receipts from those sales in its gross income. According to Malicki, Gold Emporium did not treat the receipt of the Suisse credits as a taxable event because he thought it unnecessary inasmuch as the store was exchanging gold for gold and the proceeds from the sale of the gold bullion would be included in income when deposited into the store's checking account. Respondent, on the other hand, contends that petitioners failed to adduce sufficient proof to show Gold Emporium included in income receipts from the sale of the Suisse credits, other than three Suisse credits sold to Kathleen Russo and nine Suisse credits sold to Fox Valley Coin. Thus, respondent argues, petitioners have not satisfied their burden of proof on this issue. We agree with respondent. Petitioners rely for the most part on the testimony of Malicki to substantiate their allegations that, for the years in suit, Gold Emporium's gross receipts included the proceeds from the sales of the Suisse credits, or Krugerrands exchanged for the Suisse credits, which the store obtained from Pease & Curren. At trial, Malicki attempted to identify from Gold Emporium's sales invoices sales *616 of Suisse credits or Krugerrands. We find Malicki's testimony, speckled with "could be," "probably," "likely," "might be," and similar terms, to be more conjecture than fact and not credible evidence. Gold Emporium cannot trace from its records the disposition, including sale or exchange, of the Suisse credits it obtained from Pease & Curren. The sales invoices introduced into the record, for the most part, fail to describe the item being sold by Gold Emporium. Those sales invoices which identify specifically the sale of Suisse credits or Krugerrands do not establish in any way their source. Gold Emporium obtained gold coins, including Krugerrands, collectors coins, and possibly Suisse credits, from sources other than Pease & Curren. We find improbable, and unsupported by the record, Malicki's testimony that only "a couple" of the Suisse credits or Krugerrands Gold Emporium sold during the years in issue were obtained from over-the-counter purchases. This Court is not required to accept unquestionably the self-serving testimony of petitioner. See Geiger v. Commissioner,440 F.2d 688, 689-690 (9th Cir. 1971), affg. per curiam a Memorandum Opinion of this *617 Court, cert. denied 404 U.S. 851 (1971); Sharwell v. Commissioner,419 F.2d 1057, 1060 (6th Cir. 1969), affg. on this issue a Memorandum Opinion of this Court; Tokarski v. Commissioner,87 T.C. 74, 77 (1986). We observed Malicki's demeanor and performance on the stand when testifying and considered the plausibility of his testimony in conjunction with the documentary evidence and the testimony of the other witnesses. For the most part, we found him equivocal, ambivalent, evasive, and unconvincing. He was not a credible witness. Consequently, we do not regard his testimony to be reliable or trustworthy evidence. Based on the record as a whole, we are not persuaded that Gold Emporium has included in its gross receipts, for any year, proceeds from the sale of the ninety-six Suisse credits it received from Pease & Curren. Respondent's counsel on brief has generously conceded the sales of Suisse credits to Kathleen Russo (three) and Fox Valley Coin (nine) as being sales of Suisse credits Gold Emporium received from Pease & Curren. We do not choose to enlarge upon respondent's largess. Consequently, we hold that Gold Emporium *618 has not satisfied its burden of proving by the preponderance of the credible evidence that it reported the income in question. [13] Therefore, Gold Emporium must include the fair market value of the eighty-four, nontraced Suisse credits in its gross receipts for its fiscal year ending September 30, 1980. *619 The Disputed Avon Metal Transactions
Based on a gold/silver project he conducted in the State of Wisconsin, respondent determined that Gold Emporium received certain taxable receipts from Avon Metal which Gold Emporium did not include in income for its fiscal year ending September 30, 1980. Respondent relies on the testimony of Bard and the records of Avon Metal to support his allegation that Gold Emporium received from Avon Metal unreported income in the amount claimed. Gold Emporium relies on the testimony of Malicki and the absence of any sales invoices evidencing the alleged transactions to support its contention that Gold Emporium never received this income. According to Malicki, for the period during which Avon Metal made delayed payments to its customers for purchases, Gold Emporium stopped selling scrap metal to Avon Metal. Thus, Gold Emporium denies the transactions ever occurred. Bard of course claims that the transactions did occur. According to Bard, Gold Emporium never gave Avon Metal a sales invoice to evidence a transaction between the two corporations. Bard further stated that he never requested a sales invoice from Gold Emporium regarding Avon Metal's *620 purchase of scrap metal from Gold Emporium. Based on our review of the entire record, we cannot agree entirely with respondent or petitioners. For the reasons set forth below we find that Gold Emporium received income from Avon Metal which Gold Emporium failed to include in income. We do not agree, however, with the amount of unreported income as determined by respondent. The record does not provide information sufficient for us to determine the exact amount of unreported income. Therefore, we have made as close an approximation as we reasonably can from the evidence. See Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). Consequently, we hold that, in addition to the receipts from Avon Metal which Gold Emporium included in gross receipts on its Federal corporate income tax return for the fiscal year ending September 30, 1980, the store received the following amounts from Avon Metal: Date
Amount
January 7, 1980
$   3,007.00
January 28, 1980
29,850.12
March 6, 1980
5,325.00
March 31, 1980
26,151.00
April 17, 1980
20,473.00
April 30, 1980
32,873.55
June 10, 1980
9,669.00
December 30, 1980
4,300.00
Total
$ 131,648.67
*621 Petitioners correctly point out that the outcome of this issue hinges to a great extent on the credibility of Bard and Malicki and the completeness and consistency of the corporations' records. Neither factor helps Gold Emporium here, however. Both witnesses have an interest in the outcome of this litigation. [14] We concluded earlier that Malicki was not a credible witness and that his testimony was not reliable or trustworthy. We closely observed Bard's demeanor and performance on the stand when testifying and considered the plausibility of his testimony in conjunction with the documentary evidence and the testimony of the other witnesses. We found Bard also not to be a credible witness and, consequently, we do not regard his testimony to be reliable or trustworthy evidence. *622 Furthermore, the records of both corporations provide us little help. Both Gold Emporium's and Avon Metal's records of purchases and sales lack the specificity and consistency needed to verify accurately income and expenses. For the years in issue, Avon Metal retained no receipts or cancelled checks to verify it purchases. Correlatively, Gold Emporium used no reliable system, such as cash register tapes, to verify its receipts. Both Gold Emporium and Avon Metal dealt primarily in cash. Taxpayers who shun more reliable and consistent recordkeeping methods which better facilitate verification of income and/or expenses obviously sow fertile fields for fraud. Therefore, this Court must view cash transactions with a close scrutiny and much skepticism. We believe in this case that Malicki and Bard both failed to maintain adequate records and used cash for such a large number of their transactions primarily to obscure, as much as possible, the full extent of their corporations' income for these years. Both Malicki and Bard impressed us as astute businessmen. Bard has a law degree. The use of checks was not unknown to either man. Gold Emporium issued over one million dollars *623 in checks for purchases alone in its fiscal year ending September 30, 1980, and Avon Metal issued a large number of checks payable to cash to obtain funds for its transactions. There is nothing in the record which would lead us to believe that either corporation's customers would not accept checks. Yet, they dealt primarily in cash. Based on our assessment of the credibility of both Bard and Malicki, and the reliability of their corporations' books and records, we considered their testimony with only a grain of salt. The two corporations had dealings before and after the disputed sales allegedly occurred. Malicki placed telephone calls to Bard during the time in which the disputed sales allegedly occurred. Malicki and Bard contradict each other as to the purpose of these calls. According to Malicki, he placed these calls to Bard during this time to ascertain Avon Metal's terms. Bard claims that the calls were for the purpose of transacting business. Malicki said that, during the time he did not deal with Avon Metal (which he estimated was probably from mid-January 1980 through April or May 1980), he dealt primarily with Pease & Curren because it paid him more for the value *624 of the gold in the scrap metals and the refinery paid him usually within four weeks of a shipment. However, during the period in which the disputed sales allegedly occurred, notwithstanding Malicki's assertions to the contrary, Pease & Curren also took eight to ten weeks to pay Gold Emporium for the precious metals the store mailed to the refinery. Moreover, when dealing with Pease & Curren, Gold Emporium incurred costs, such as shipping and handling, which the store did not incur in its transactions with Avon Metal, thereby reducing somewhat the net advantage in dealing with the refinery. According to Malicki, Gold Emporium purchased "a lot of gold" from the public during the time that the disputed transactions allegedly occurred. The record does not reveal the quantity of scrap metal Gold Emporium purchased over-the-counter during this period. Therefore, from this record, we cannot say that Gold Emporium did not have sufficient scrap metal to sell to both Pease & Curren and Avon Metal when the alleged sales occurred. We believe it is more probable that Gold Emporium continued to do business with Avon Metal during this period and received from Avon Metal cash which was not included *625 in the store's gross receipts. We are not persuaded, however, that the January 29, 1980, transaction occurred. The amount of this alleged transaction, far in excess of the amount of any other transaction between Avon Metal and Gold Emporium, confirmed or alleged, appears inconsistent with Gold Emporium's practices and strikes us as incredulous. Therefore, based on the record as a whole, we find that Gold Emporium did not receive the alleged $ 60,393 from Avon Metal on that date. Petitioners have failed to carry their burden of proof on the remaining disputed Avon Metal transactions. Consequently, we find that Gold Emporium received the payments set forth above which Gold Emporium failed to include in gross receipts. The Constructive Dividend Issue
Respondent does not claim that the unreported gross receipts were in the nature of salary to Malicki. Respondent asserts instead that Gold Emporium's unreported income was diverted by Malicki to his personal use and, thus, Malicki received a constructive dividend from Gold Emporium in the amount of the unreported income. Petitioners contend that there was no unreported income to divert, and, hence, there was no constructive *626 dividend to receive. Gross income includes income from whatever source, including dividends. Sec. 61(a)(2). Sections 301 and 316 provide that a distribution of property made by a corporation to a shareholder with respect to its stock shall be treated as a dividend to the extent of the earnings and profits of the corporation. A stockholder receives a constructive dividend where he receives an economic benefit as a result of a payment made to him or for his benefit by the corporation. Commissioner v. Riss,374 F.2d 161, 167 (8th Cir. 1967). When controlling stockholders divert corporate income to themselves, such diverted funds should be treated as constructive dividends. Truesdell v. Commissioner,89 T.C. 1280, 1293-1301 (1987); Simon v. Commissioner,248 F.2d 869, 876-877 (8th Cir. 1957); Dawkins v. Commissioner,238 F.2d 174, 178 (8th Cir. 1956). [15]
In support of his *627 contention that Malicki diverted the unreported income, respondent points to the $ 10,300 in deposits to the Malickis' personal bank accounts which cannot be traced to reported taxable or nontaxable deposits. He also argues that the Malickis rented two safe deposit boxes in 1980 in which the Malickis could have stashed the Suisse credits Gold Emporium received from Pease & Curren. Petitioners have the burden of proof on this issue. Commissioner v. Riss,374 F.2d at 166. The Malickis have not persuaded us on this record that they did not divert the unreported income to their own use. In 1980 the Malickis had unexplained, unreported deposits to their personal checking account of $ 10,300. According to Malicki, this $ 10,300 came from cash Malicki received from his bank when he cashed checks representing reported taxable income or non-taxable receipts; he said that he often did not deposit the total amount of the checks which he received. Malicki stated that he kept large sums of cash on hand; 1980 was a tremendous year and there was a lot of cash available for personal purchases, such as a snowmobile, bikes for the kids, furniture, or anything at all; he often *628 used cash to buy what he wanted. According to Malicki, at times some of the undeposited cash he had on hand would be deposited later into their personal checking account when his wife needed funds. We are not persuaded by Malicki's explanation regarding the source of these untraced funds. We note that Malicki admitted he did not deposit all monies he received into his personal checking account or savings accounts and that he often carried large sums of cash which, at times, he used to purchase expensive, personal items. Therefore, it is probable that respondent simply was unable to identify all of the Malickis personal cash purchases in 1980 which could be traced to the unreported income. Furthermore, the Suisse credits, or Krugerrands exchanged for them, easily could have been stored in the Malickis' personal safe deposit boxes. The Malickis also have not established that Gold Emporium did not have sufficient earnings and profits to pay Malicki dividends in the amounts determined. We find that the Malickis have not carried their burden of proof on this constructive dividend issue; therefore, we conclude that Malicki received constructive dividends from Gold Emporium in the *629 amount of the unreported income from Pease & Curren and Avon Metal as determined above. Fraud Issue
Respondent contends that all or part of the underpayment of taxes for the years in issue for Gold Emporium and the Malickis is due to fraud because of the substantial omission of income, the failure to cooperate with respondent, the lack of adequate records, and the destruction of records. Petitioners contend that they did not have any general or specific intent to evade tax, and, in fact, did not evade tax. Petitioners argue that there was no conduct by them that was intended to conceal income or mislead respondent. Petitioners further contend that they cooperated with respondent in the course of his examination of their tax returns. We find that respondent has not established fraud here by clear and convincing evidence. Section 6653(b) provides for a 50-percent addition to tax if any part of any underpayment is due to fraud. Fraud is defined as an intentional wrongdoing designed to evade tax believed to be owing. Powell v. Granquist,252 F.2d 56 (9th Cir. 1958); *630 Mitchell v. Commissioner,118 F.2d 308 (5th Cir. 1941); Estate of Pittard v. Commissioner,69 T.C. 391 (1977). Respondent has the burden of proving by clear and convincing evidence that an underpayment exists for the years in issue and that some portion of the underpayment was due to fraud. Sec. 7454(a); Rule 142(b). To meet this burden, respondent must show that petitioners intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Rowlee v. Commissioner,80 T.C. 1111 (1983). Respondent need not prove the precise amount of the underpayment resulting from fraud, but only that some part of the underpayment of tax for each year in issue is attributable to fraud. Lee v. United States,466 F.2d 11, 16-17 (5th Cir. 1972); Plunkett v. Commissioner,465 F.2d 299, 303 (7th Cir. 1972), affg. a Memorandum Opinion *631 of this Court. The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978); Estate of Pittard v. Commissioner, supra. Fraud is not to be imputed or presumed, but rather must be established by some independent evidence of fraudulent intent. Beaver v. Commissioner,55 T.C. 85, 92 (1970); Otsuki v. Commissioner,53 T.C. 96 (1969). However, fraud may be proven by circumstantial evidence and reasonable inferences drawn from the facts because direct proof of the taxpayer's intent is rarely available. Spies v. United States,317 U.S. 492 (1943); Rowlee v. Commissioner, supra;Stephenson v. Commissioner,79 T.C. 995 (1982), affd. 748 F.2d 331 (6th Cir. 1984). The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner,56 T.C. 213, 223-224 (1971); *632 Otsuki v. Commissioner,53 T.C. at 105-106 (1969). The intent to conceal or mislead may be inferred from a pattern of conduct. See Spies v. United States,317 U.S. at 499. Courts have relied on a number of indicia of fraud in deciding section 6653(b) cases. Although no single factor is necessarily sufficient to establish fraud, the existence of several indicia is persuasive circumstantial evidence of fraud. Solomon v. Commissioner,732 F.2d 1459, 1461 (6th Cir. 1984), affg. per curiam a Memorandum Opinion of this Court; Beaver v. Commissioner,55 T.C. at 93. A pattern of underreporting income over an extended period of time is indicative of fraud. Foster v. Commissioner,391 F.2d 727, 733 (4th Cir. 1968), affg. on this issue a Memorandum Opinion of this Court; Brooks v. Commissioner,82 T.C. 413, 431 (1984), affd. without published opinion 772 F.2d 910 (9th Cir. 1985). However, the mere failure to report income is not sufficient to establish fraud. Merritt v. Commissioner,301 F.2d 484, 487 (5th Cir. 1962). *633 Fraud may not be found under "circumstances which at most create only suspicion." Davis v. Commissioner,184 F.2d 86, 87 (10th Cir. 1950); Katz v. Commissioner,90 T.C. 1130 (1988). Other badges of fraud which may be taken into account include: the making of false and inconsistent statements to revenue agents, Grosshandler v. Commissioner,75 T.C. 1, 20 (1980); the filing of false documents, Stephenson v. Commissioner,79 T.C. at 1007; understatement of income, inadequate records, failure to file tax returns, implausible or inconsistent explanations of behavior, concealment of assets, and failure to cooperate with tax authorities. Bradford v. Commissioner,796 F.2d 303 (9th Cir. 1986), affg. a Memorandum Opinion of this Court. Respondent cannot rely on the taxpayer's failure to prove error in respondent's determination to meet his burden of proving fraud. Habersham-Bey v. Commissioner,78 T.C. 304, 312 (1982); Otsuki v. Commissioner,53 T.C. at 106; Pigman v. Commissioner,31 T.C. 356, 370 (1958). While we are dealing with an individual *634 taxpayer (Malicki) for the year 1980 and a corporate taxpayer (Gold Emporium) for the years ending September 30, 1980, and September 30, 1981, we look to the actions and intentions of Malicki to determine fraud. His conduct, as president and sole shareholder of Gold Emporium, is imputed to Gold Emporium for the years ending September 30, 1980, and September 30, 1981. See American Lithofold Corp. v. Commissioner,55 T.C. 904, 925 (1971); Federbush v. Commissioner,34 T.C. 740, 749 (1960), affd. 325 F.2d 1 (2d Cir. 1963). Respondent does not contend here that petitioners underreported income over an extended period of time. The transactions in issue all relate to calendar year 1980. Nothing in the record would lead us to conclude that petitioners understated their income over an extended period of time. We have found a substantial understatement of income for the years in suit; however, a large part of our determination is based on petitioners' failure to carry their burden of proof by a preponderance of the evidence. As we stated above, respondent cannot rely on petitioners' failure of proof to meet respondent's burden of *635 proving fraud. Where fraud is concerned, respondent carries the burden of proof by the higher standard of clear and convincing evidence. Respondent's evidence here simply does not meet that standard. Petitioners' records here were inadequate. Nevertheless, records do exist and we do not find those records to be so deficient as to support a finding of a fraudulent attempt to conceal income. Petitioners dealt mainly in cash. Gold Emporium did not maintain any system to verify that all cash receipts were deposited to the corporate bank account and included in gross income. Nonetheless, during the examination of Gold Emporium's tax returns in conjunction with respondent's gold/silver project, except for the disputed transactions with Avon Metal, respondent could and did trace alleged receipts from the other coin dealers in the gold/silver project to Gold Emporium's deposits and subsequently to gross receipts. Gold Emporium concedes it should have included in income in 1980 the Suisse credits it received from Pease & Curren, but argues that there was no unreported income from this issue because Gold Emporium included in gross receipts the proceeds from the sales of these Suisse *636 credits. Gold Emporium's failure to prove, except for those sales conceded by respondent, that the proceeds from sales of the Suisse credits it received from Pease & Curren (or Krugerrands it exchanged for the Suisse credits) were in fact included in gross income in 1980 proves only that Gold Emporium's recordkeeping system was inadequate -- it does not establish, especially by clear and convincing evidence, an intention to evade taxes. "The conscious purpose to defraud proscribed by the statute does not include negligence, carelessness, misunderstanding or unintentional understatement of income." United States v. Pechenik,236 F.2d 844, 846 (3d Cir. 1956). Respondent argues that Gold Emporium's only reason for requesting the Suisse credits from Pease & Curren was to evade the payment of income taxes. According to Malicki, Gold Emporium requested the Suisse credits from Pease & Curren because the store wanted gold to sell to its customers. Malicki said further that he wanted the Suisse credits even when the price of gold was falling because he got a premium on them. Thus, *637 petitioners contend, Gold Emporium had valid business reasons for requesting the Suisse credits. Respondent offers no evidence to support his allegations but relies only upon his own suspicion. Based on the record here, we find petitioners' reasons for requesting the Suisse credits to be plausible. We found that Gold Emporium failed to include in gross receipts $ 131,648.67 from its sales of scrap metal to Avon Metal. However, petitioners had the burden of proving by the preponderance of the credible evidence that Gold Emporium did not receive this income from Avon Metal. They were unable to do so. This failure of proof does not establish an intent to evade tax by clear and convincing evidence, however. Respondent relies solely on Bard's testimony and Avon Metal's records to prove that the disputed transactions between Gold Emporium and Avon Metal occurred. We do not find this evidence to be reliable or trustworthy. As a matter of fact, we found neither Malicki nor Bard to be reliable witnesses, but two wrongs in these circumstances where fraud is involved do not prove respondent right, especially in the egregious situation, such as the one before us, where Malicki and Bard *638 each tried to pin the tail on the other's donkey. Therefore, respondent has not shown by clear and convincing evidence that these disputed transactions in fact did transpire. The Malickis concede they underreported their capital gains and interest income on their 1980 tax return. According to Malicki, to memorialize the origin of deposits into their savings accounts, he entered notations of the source of the deposits on his savings account passbooks. Malicki stated that he referred to his savings accounts passbooks when Lanko prepared the Malickis' income tax returns. The Malickis contend they misplaced the savings account passbook which contained notations about these transactions, the transactions occurred early in 1980, and they "forgot" about the income when the tax return was prepared in 1981. The "found" passbook does contain a notation showing a deposit of interest, but no notation for the deposit of funds which included the capital gain. Nonetheless, while we do not condone this omission of income and find their explanation for its omission somewhat flimsy and not totally supported by record, the Malickis' explanation does have some degree of plausibility. We note *639 too that the Malickis also "forgot" to include a capital loss on their tax return for 1980. Again, the omission of this income by the Malickis does not establish fraud by clear and convincing evidence. Respondent's case for fraud rests primarily upon suspicion and the testimony of Bard. As stated above, suspicion alone does not establish fraud and we found Bard's testimony far from credible. Respondent's evidence here would be sufficient to establish an addition to tax for negligence under section 6653(a); however, respondent did not assert negligence as an alternative argument here and we cannot impose the addition to tax for negligence absent it being pleaded. See Markwardt v. Commissioner,64 T.C. 989, 997 (1975), and cases cited therein. We considered respondent's other contentions regarding his assertions of fraud but find them unpersuasive. Based on the record as a whole, we find that respondent has not established fraud by clear and convincing evidence. Consequently, we hold for petitioners on this issue. To reflect the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. These cases have been consolidated for purposes of trial, briefing, and opinion. ↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue, and rule references are to the Tax Court Rules of Practice and Procedure.↩
*. The addition to the tax does not apply to Kathleen Malicki. ↩
3. Gold Emporium also disbursed $ 4,706 to R. J. Walters during this period. The Court notes that a Dick Walters, identified as Malicki's brother-in-law, allegedly purchased the store from Malicki sometime in 1981 or 1982. The record does not show whether this is the same Dick Walters to whom Gold Emporium paid the $ 672,149.15 for purchases.↩
4. A Krugerrand is a gold coin issued by the Republic of South Africa. Webster's II New Riverside University Dictionary (1984). Krugerrands are round and contain one ounce of gold and alloy.↩
5. During this period, the Chicago refinery changed its method for paying Bard in that it stopped giving him advances on the day he delivered precious metals to it. The Chicago refinery paid Bard eight weeks after delivery during this period.↩
6. Respondent now concedes that a $ 9,500 sale amount shown on Gold Emporium's books and records for June 10, 1980, was part of this purported $ 19,169 sale amount.↩
7. Bard's daily log of purchases show that Avon Metal made the following purchases from Gold Emporium for this same period: ↩
Date or Period
Amount
Week of 10/07 -- 10/13/79
$ 12,952.00
10/15/79
10,284.00
Week of 10/14 -- 10/20/79
11,672.00
10/25/79
9,367.50
Week of 11/01 -- 11/03/79
4,291.00
Week of 11/04 -- 11/10/79
12,596.00
01/07/80
3,007.00
01/28/80
29,850.12
01/29/80
60,393.00
03/06/80
5,325.00
03/31/80
26,151.00
04/17/80
20,473.00
04/30/80
32,873.55
06/10/80
19,169.00
12/30/80
4,300.00
8. This item represents the value of the ninety-six Suisse credits Gold Emporium received from Pease & Curren, see supra.↩ The parties now agree that the total value of these Suisse credits was $ 50,897.70. 9. See note 8, supra.↩
10. The parties have stipulated that the Malickis are entitled to only $ 4,880 as the correct amount of a partnership loss claimed for 1980 with respect to Time Sharing Associates, and that the Malickis are liable for the addition to tax provided by sec. 6621(d). Sec. 6621(d) has been redesignated as sec. 6621(c) by sec. 1511(c)(1)(A) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2744.↩
11. This $ 19,686 includes the $ 12,336.50 unreported capital gain discussed above and the return of capital the Malickis invested in their personal Blunt, Ellis & Loewi account.↩
12. It is not clear from this record exactly what assets Malicki sold to Walters. It appears that Walters purchased the leasehold improvements, the fixtures, the right to use the name "Gold Emporium," and, possibly, goodwill.↩
13. Petitioners alleged, and we found, that respondent lost some of Gold Emporium's records for the fiscal year ending September 30, 1981. While we do not condone respondent's mishandling of Gold Emporium's records, we believe that the loss of those records can have no effect on our determination under the circumstances here. Pease & Curren was not Gold Emporium's sole source for gold bullion. Gold Emporium did not maintain any records with which it could trace the disposition of the Suisse credits it received in 1980 from Pease & Curren. Gold Emporium did not keep any records showing exchanges of Suisse credits for Krugerrands. Furthermore, the "representative" sales invoices introduced at trial overlap both fiscal years in issue. Those sales invoices simply do not supply information sufficient to trace the ninety-six Suisse credits Gold Emporium received from Pease & Curren in 1980. There is nothing in the record to indicate that Gold Emporium changed its method of recordation for the period from February 1, 1981, through September 30, 1981, the months for which some of Gold Emporium's records are missing. Therefore, we conclude that respondent's loss of Gold Emporium's records did not prevent Gold Emporium from carrying its burden of proof on this issue and, thus, can have no effect upon the outcome of this case.↩
14. Avon Metal also was examined as part of respondent's gold/silver project. In order to avoid what he perceived to be a potential whipsaw problem, respondent issued notices of deficiency to Avon Metal in which, among other things, he disallowed the disputed cash purchases from Gold Emporium which are in issue in this case. Avon Metal filed a petition with this Court, docket No. 43174-85, which is still pending. The parties in that case have not agreed to be bound by the outcome of our determination here, nor have the parties in this case agreed to be bound by our determination in Avon Metal's case. Nonetheless, while testifying, Bard could well have believed that it was to his advantage, as the sole shareholder of Avon Metal, for this Court to sustain respondent on this issue in the instant case to bolster his claim for the deductibility of the purchases expensed on Avon Metal's tax returns but disallowed by respondent.↩
15. See also Delgado v. Commissioner,T.C. Memo. 1988-66; Ball v. Commissioner,T.C. Memo. 1982-474↩.