ERIC L. VAUGHAN AND DENISE M. VAUGHAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Vaughan v. Commissioner
Docket No. 13316-92
United States Tax Court
T.C. Memo 1994-8; 1994 Tax Ct. Memo LEXIS 10; 67 T.C.M. (CCH) 1936; January 10, 1994, Filed *10 Decision will be entered under Rule 155. For petitioners: John D. Copeland and Gary A. Moreland. For respondent: James Prothro and Julie Porter. PATE
PATE
MEMORANDUM FINDINGS OF FACT AND OPINION PATE, Special Trial Judge: This case was assigned pursuant to the provisions of section 7443A(b)(3) and Rules 180, 181, and 182. [1]
Respondent determined a deficiency in petitioners' 1988 Federal income tax of $ 7,199 and that they are liable for additions to tax under section 6653(a)(1)(A) of $ 360, section 6653(a)(1)(B) of 50 percent of the interest due on the portion of the underpayment due to negligence, and section 6661 of $ 1,800. Respondent also determined a deficiency in petitioners' 1989 Federal income tax of $ 3,050 and that they are liable for additions to tax under section 6651 of $ 610 and section 6662 of $ 610. After a concession by respondent, *11 [2] the issues for our decision are: (1) Whether we should shift the burden of proof to respondent; [3]
(2) whether petitioner Eric L. Vaughan underreported his income from Smartech Systems, Inc.; and (3) whether petitioners are liable for the additions to tax determined by respondent. FINDINGS OF FACT Some of the facts have been stipulated, and they are so found. Petitioners are husband and wife and filed joint income tax returns for 1988 and 1989. They resided in Mansfield, Texas, at the time they filed their petition. Eric L. Vaughan (hereinafter petitioner) has worked *12 in the computer industry for approximately 8 years. He studied computers and accounting for 2 years at Western Michigan University, and then started working as a data entry operator. In 1982, he moved to Dallas, Texas, where he worked for Affiliated Computer Systems (whose name was later changed to M Tech), a company providing data processing services to multi-branch banks and ATM's. While at M Tech, he was promoted to assistant vice president in charge of technical services. In 1986, he left M Tech to start his own company, Smartech System Solutions, Inc. (hereinafter Smartech Solutions). Smartech Solutions provided consulting services to the "main-frame" computer industry. In 1987, a business acquaintance offered to sell petitioner a software package called Display Operator Console Support (hereinafter DOCS or the software). Because petitioner was unable to personally finance the purchase price, he contacted Mr. Robert Mohr (hereinafter Mohr) to interest him in the enterprise. Mohr holds a bachelor of science degree in business from Massachusetts Institute of Technology and, at the time of trial, was chief executive officer and chairman of DMDA, Inc. In April 1987, petitioner *13 and Mohr formed DOCS Acquisition Corp. (hereinafter DOCS Acquisition or the Corporation), a corporation in which Mohr invested $ 100,000, and petitioner contributed his experience and expertise. Mohr received 95 percent and petitioner 5 percent of the capital stock. The two men constituted the board of directors. Mohr was elected chairman of the board and treasurer; petitioner was elected president and secretary. To finance the purchase of the software, Mohr also loaned the Corporation $ 1.2 million. The Corporation signed a note promising to repay Mohr in equal annual principal payments over a 10-year period; 1-percent interest was payable each month. The Corporation then purchased the DOCS software, the customer list, and all pertinent records for approximately $ 1.2 million. On July 15, 1987, the Corporation was renamed Smartech Systems, Inc. (hereinafter Smartech). Smartech's income was derived primarily from renting DOCS on a monthly, yearly, or biyearly basis. On July 14, 1987, petitioner and the Corporation entered into an agreement whereby petitioner accepted employment as its president and chief operating officer. As such, petitioner was empowered to: manage *14 and direct the day-to-day operations of the Company, and * * * participate in the management and direction of the Company, including strategic planning, advising and counseling, and such other lawful, reasonable and necessary tasks as the Board requests from time to time during the term of this Agreement. * * *
Petitioner also agreed that: All services to be performed by Vaughan shall be performed (a) to the best of his ability and to further the welfare, development, and profitability of the Company and (b) wherever the business needs of the Company may require the attention of Vaughan. Vaughan agrees that he will conduct himself in a professional and ethical manner at all times * * *, and will take no action that might cause injury to the business or goodwill of the Company. * * *
Under the agreement, petitioner was to be paid an annual base salary of $ 98,400 and a yearly car allowance of $ 4,800; be reimbursed for reasonable business expenses including, but not limited to, expenses incurred for travel and entertainment; and be paid a bonus (payable upon the occurrence of certain events) equal to: 25% of (i) the sum of (1) the Company's annual revenues from *15 computer software sales less commissions and royalties paid to persons other than David L. Shepherd plus (2) all other annual revenues from products sold less the costs (excluding reasonable and customary operating expenses) of such products to the Company, minus (ii) $ 1,000,000. * * *
In addition, his bonus was to be reduced by: an amount equal to 50% of all royalties paid or accrued to Richard K. Goran on one-time sales by the Company of "DOCS" software under the terms of the Asset Purchase Agreement dated as of June 17, 1987, by and between the Company, CFS, Inc., and Richard K. Goran. To the extent the Bonus Adjustment exceeds the amount of the Bonus that would otherwise be payable, the unused portion of the Bonus Adjustment shall be applied against the Bonus that would otherwise be payable thereafter until the entire Bonus Adjustment has been applied. * * *
Under these provisions, in 1988, petitioner earned a bonus equal to 25 percent of Smartech's gross profit of $ 1,048,652, less $ 1 million ($ 48,652), or $ 12,163. However, all of petitioner's bonus was absorbed by the offset against royalties paid to Mr. Goran. In 1989, Smartech's gross profit was $ 1,114,350, *16 resulting in a bonus of $ 28,457, less $ 4,607 for royalties paid to Mr. Goran. [4] However, this bonus was not computed prior to petitioner's leaving the Corporation's employ. As president and chief operating officer, petitioner managed all of the operations of Smartech. He hired, fired, and supervised all of its employees. He negotiated leases, purchased office and other business supplies, monitored its financial affairs, signed checks, and advertised for customers. At all times relevant to this case, Smartech employed a bookkeeper, who was responsible for maintaining the records of the company, including recording accounts receivable and accounts payable, and preparing checks for disbursement. [5] However, the bookkeeper could make payments to vendors only after petitioner *17 reviewed the aged accounts payable schedule and decided which vendors were to be paid. The computer automatically produced checks in payment of invoices recorded as accounts payable. Checks for items not recorded as accounts payable had to be manually prepared by the bookkeeper. The bookkeeper did not issue payroll checks; a separate company performed this function. Both Mohr and petitioner were authorized to sign checks. Mohr did not participate in the day-to-day operations of Smartech, but met with petitioner each month to review the Corporation's progress. He reviewed the financial statements monthly (balance sheet and income statement) and participated in making significant business decisions. He advised the Corporation on marketing, strategic planning, *18 and financial issues. He did not examine the books, the monthly bank statements, or the canceled checks. In February 1988, petitioner began authorizing, by filling out a manual check request form, the preparation of checks to himself for amounts ranging from $ 1,000 to $ 10,000. On the manual request forms, petitioner designated to whom the check was to be payable, the amount of the check, and the general ledger account to be charged. The following is a list of the checks issued pursuant to petitioner's request and at issue in this case: Date
[1] Amount
General Ledger AccountCharged/  Description (if any)  02/05/88
$ 3,500 Employee Advance (EA)  02/09/88
2,000
EA-travel for petitioner (Check payable  to Linda Roberts)  02/29/88
5,500
Transfer from EA to Accounts Receivable  (AR)  03/09/88
3,000
Travel/Entertainment-travel for  petitioner (Check payable to Sheila  Harper)  07/14/88
1,000
EA (Check payable to Mastercard)  08/03/88
[2] 2,000
Machinery & Equip.  09/02/88
1,400
$ 1,000 to EA  10/03/88
3,400
3,000 to EA  10/31/88
3,000
Transfer from EA to AR  11/01/88
5,000
EA  11/30/88
5,000
Transfer from EA to AR  01/24/89
2,000
EA  04/06/89
2,500
EA  04/18/89
2,000
EA  04/30/89
4,500
Transfer from EA to AR  05/09/89
3,500
EA  05/31/89
3,500
Transfer from EA to AR  06/15/89
6,000
EA  06/30/89
6,000
Transfer from EA to AR  07/05/89
10,000
Notes Receivable  07/31/89
10,000
Transfer from Notes Receivable to AR  08/11/89
6,800
EA  08/31/89
6,800
Transfer from EA to AR  10/12/89
[3] 3,030
EA for international currency (Check  payable to Sheila Harper)  10/06/89
3,000
EA  10/31/89
4,498
Transfer from EA to AR-adjust bonus  advance  11/03/89
6,500
EA  12/11/89
1,000
EA  12/07/89
3,000
EA  12/31/89
4,000
Transfer from EA to AR  12/21/89
4,432
Commissions  *19 In addition, petitioner authorized the bookkeeper to pay several of his personal expenses, including computer software for his children, legal fees, and his wife's travel expenses. Such purchases totaled approximately $ 2,600. At the end of each month, petitioner authorized the bookkeeper to make a general ledger entry transferring the amount he received which had been charged to the "employee advances" account into the "accounts receivable" account. In general, "accounts receivable" was the account used to record amounts due to the company from its customers for the sale of goods and services. During 1988 and 1989, Mohr became increasingly concerned about the large amount of accounts receivable appearing on the balance sheet and the resulting poor cash flow. He pressed petitioner for details concerning uncollected accounts and requested a schedule of customers owing money to Smartech. It is unclear from the record whether petitioner ever submitted such a list to Mohr. In November or December of 1989, the bookkeeper questioned petitioner as to the advisability of his drawing a large salary and making substantial cash advances to himself when the company was unable to pay its *20 bills on a timely basis. Afterward, petitioner drafted several memorandums describing his discontent with the bookkeeper's job performance and, in June 1990, terminated her employment. When petitioner failed to discontinue making advances to himself, the new bookkeeper, concerned about the financial stability of the company and her job security, asked a temporary employee to phone Mohr and advise him of petitioner's actions. Mohr received several phone calls from this "anonymous" caller, each call providing more details than the first. After a few such calls, Mohr contacted his accountant to discuss possible financial improprieties at Smartech. In August 1990, Mohr met several of his accountants at Smartech's office to conduct an examination of the Corporation's books and records. During these and subsequent examinations, the accountants discovered the checks enumerated above, the general ledger accounts originally charged, and the subsequent transfers from "employee advances" to "accounts receivable". In their opinion, petitioner's practices in this regard were "irregular and inappropriate". Until this time, Mohr was unaware that the Corporation had been advancing petitioner *21 money. Mohr then confronted petitioner with the accountants' findings. Petitioner explained that he considered these checks to be advances which he planned to repay by offsetting them against his yearend bonuses when they became payable. Nevertheless, by the end of the meeting, Mohr prevailed upon petitioner to agree to sign a note payable to Smartech for these advances. The next day, Mohr informed petitioner that his employment was terminated. Subsequently, petitioner gave Smartech a $ 5,000 check in partial payment of the advances, and signed an Agreement and Release and a Note Payable for $ 70,000. The note called for monthly interest payments and a balloon principal payment. The note also provided that the final principal amount would be adjusted if the advances to petitioner exceeded those already discovered by the accountants. Petitioner made several interest payments on the note, but then filed for bankruptcy on July 23, 1991. Smartech filed a proof of claim for $ 70,000 with the bankruptcy court, which was ultimately discharged. In August 1991, Mohr (as president of Smartech) sent a letter to the Dallas County District Attorney alleging that petitioner had "blatantly *22 removed company funds for his personal use and had taken measures to cover-up his activities". However, petitioner was never criminally prosecuted for the transactions at issue in this case. On their 1988 income tax return, petitioners reported gross income of $ 103,200, which included petitioner's base salary and car allowance, but did not include any advances that petitioner received from the Corporation during 1988. On their 1989 income tax return, petitioners reported gross income of $ 153,984, which included petitioner's base salary, car allowance, and $ 50,065 in advances. Petitioner included the advances in his gross income on his 1989 income tax return upon the advice of his accountant. During 1991, Mohr's accountants advised him that Smartech should file a Form 1099-Misc. with the Internal Revenue Service reflecting the advances as "embezzled funds" constituting nonemployee compensation paid to petitioner. Eventually, a notice of deficiency was issued to petitioner for 1988 and 1989. OPINION Burden of Proof
Respondent issued a notice of deficiency to petitioners in which she determined that they had received additional income during 1988 and 1989, and stated, *23 as grounds therefor: "From records and information available, it has been determined that you received additional income in the amount shown." Petitioners contend that respondent's determination was arbitrary and without foundation and, as a result, the burden of going forward with the evidence should be placed on respondent. They contend that, from the notice of deficiency, it was "impossible to determine how the alleged deficiency was computed, the source of the alleged income, the theory supporting its taxability or any other fact which would enable petitioners to prepare and try this case." In general, a notice of deficiency is presumed correct, and the taxpayer bears the burden of proving that respondent's determination is incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). If, however, the taxpayer demonstrates that the notice of deficiency is arbitrary, the burden of going forward with the evidence shifts to respondent. Helvering v. Taylor, 293 U.S. 507 (1935); Jackson v. Commissioner, 73 T.C. 394 (1979). Generally, when respondent has not submitted any evidence linking *24 the taxpayer to the activity from which the unreported income was derived or respondent fails to provide any basis for the amount of the income determined to be correct, a taxpayer argues that the notice of deficiency is arbitrary. Berkery v. Commissioner, 91 T.C. 179, 195 (1988), affd. without published opinion 872 F.2d 411 (3d Cir. 1989). Petitioners rely on Portillo v. Commissioner, 932 F.2d 1128 (5th Cir. 1991), affg. in part and revg. in part T.C. Memo. 1990-68, and Carson v. United States, 560 F.2d 693 (5th Cir. 1977), to support their argument that the notice of deficiency issued to petitioner was arbitrary. In Portillo, respondent determined that the taxpayer, a painting subcontractor, underreported his income. Respondent's determination was based on a Form 1099 filed by one of the contractors for whom the taxpayer worked. The contractor could produce checks payable to the taxpayer for only a portion of the amount he reported he had paid the taxpayer; the contractor failed to substantiate the remainder, claiming to have *25 paid the taxpayer in cash. Nevertheless, respondent determined that the taxpayer's gross income should reflect the higher amount. Under these circumstances, the Court of Appeals for the Fifth Circuit held that respondent's determination in the notice of deficiency was arbitrary. Portillo v. Commissioner, supra, is clearly distinguishable from this case. In Portillo, the taxpayer claimed that he never received the total amount of funds reported on a Form 1099 filed by one of the contractors, and the contractor could not show that he had made such payments. In this case, there is no dispute that Smartech made the total amount of the advances it reported that it had made to petitioner. Not only has Smartech substantiated the total amount of the advances it reported to respondent; petitioner admits to having received such funds. Thus, in this case, petitioner is faced with proving whether the funds he admittedly received are includable in his income, and not, as with the taxpayer in Portillo, that the funds that were reported on a Form 1099 were never received. Similarly, in Carson v. United States, supra, *26 respondent assessed the taxpayer for excise taxes based on his alleged wagering activities. Because there was no evidence in the record that the taxpayer had engaged in the business of accepting wagers during the period in issue, the Court found that respondent's assessment was arbitrary. Again, Carson is clearly distinguishable from this case. In Carson, there was no evidence that the taxpayer was linked with the activity (gambling) in issue, whereas petitioner has admitted that he worked for Smartech and, in connection with such employment, received the advances during the years in issue. Therefore, there is no dispute that petitioner engaged in the activity giving rise to respondent's determinations. See Shriver v. Commissioner, 85 T.C. 1, 4 (1985); Green v. Commissioner, T.C. Memo. 1993-152. Accordingly, we find that the notice of deficiency is not arbitrary. Alternatively, petitioners argue that respondent raised a new matter and therefore we should shift the burden of proof to respondent. Rule 142(a). In general, a new matter is raised when "the evidence required to disprove the determination in the *27 deficiency notice is different than that required to meet the position taken by respondent at trial." Estate of Falese v. Commissioner, 58 T.C. 895, 899 (1972); see Wayne Bolt & Nut Co. v. Commissioner, 93 T.C. 500, 507 (1989); Colonnade Condominium, Inc. v. Commissioner, 91 T.C. 793, 795 n.3 (1988); Achiro v. Commissioner, 77 T.C. 881, 890-891 (1981). A new theory which merely clarifies or develops the original determination is not a new matter in respect of which respondent bears the burden of proof. Estate of Jayne v. Commissioner, 61 T.C. 744, 748-749 (1974); McSpadden v. Commissioner, 50 T.C. 478, 492-493 (1968); Way v. Commissioner, T.C. Memo. 1990-590. In the notice of deficiency, respondent determined that petitioner had received income in excess of the amount he reported on his 1988 and 1989 income tax returns. At trial, respondent maintained that same position. The record does not indicate any misunderstanding on the part of either party that the source *28 of the alleged increase in income was the advances to petitioner from Smartech, and petitioner never challenged the amount of such increase. Because the position of respondent on the notice of deficiency and at trial was that petitioner had underreported his income from Smartech, we find that no new matter was raised by respondent. [6]
*29 Nevertheless, petitioner argues that respondent refused to comply with his pretrial discovery requests, and, as a result, any theory advanced at trial would surprise and prejudice petitioner in the presentation of his case. However, petitioner engaged in substantial pretrial discovery. Before trial, the parties informally exchanged documents. Moreover, petitioners deposed some of respondent's witnesses, and additional documents were produced at those depositions. Therefore, it is clear that respondent disclosed most, if not all, of her evidence prior to trial. Finally, we note that petitioner maintains that the advances he received from Smartech were loans. If he had proved that the advances were loans, he would have prevailed in this case. He does not explain how respondent's theory that the advances petitioner received were income could have prejudiced his presentation of that position. As a result, we fail to discern how petitioner was materially prejudiced by respondent's actions. Accordingly, we decline to shift the burden of proof to respondent. Loans v. Income
Having decided that petitioner must carry the burden of proving that the advances he received from *30 Smartech were not taxable to him, we must now decide whether he has carried such burden. Petitioner argues that the advances he received from Smartech were bona fide loans, which he was empowered to make to himself, and which he intended to repay by offsets against his yearend bonuses when earned. He argues that, by virtue of these advances being loans, they do not constitute gross income. Generally, the proceeds of a loan do not constitute income to a borrower because the benefit is offset by an obligation to repay. United States v. Rochelle, 384 F.2d 748, 751 (5th Cir. 1967); Arlen v. Commissioner, 48 T.C. 640, 648-649 (1967). Deciding whether a particular transaction actually constitutes a loan, however, is a question of fact to be determined upon consideration of all the pertinent facts in the case. Fisher v. Commissioner, 54 T.C. 905, 909 (1970). Whether a bona fide debtor-creditor relationship exists is a question of fact, and essential elements are the intent of the recipient of the funds to make monetary repayment and the intent of the person advancing the funds to enforce repayment. *31 Beaver v. Commissioner, 55 T.C. 85, 91 (1970); Fisher v. Commissioner, supra at 909-910. Whether the recipient had an intent to repay and the lender an intent to enforce repayment is determined at the time of receipt of the funds. Frierdich v. Commissioner, 925 F.2d 180, 184 (7th Cir. 1991), affg. T.C. Memo. 1989-103; Estate of Chism v. Commissioner, 322 F.2d 956, 960 (9th Cir. 1963), affg. T.C. Memo. 1962-6. Indicative of an intent to repay are whether a note evidencing the indebtedness was executed, whether the parties agreed on the rate of interest, whether there was a fixed maturity date, whether a security interest was given the creditor, and whether the debtor had the ability to make repayment. Frierdich v. Commissioner, supra at 182; Busch v. Commissioner, 728 F.2d 945, 948 (7th Cir. 1984), affg. T.C. Memo. 1983-98. The advances petitioner received from Smartech lacked many of the characteristics usually *32 present when the Courts find that money advanced constitutes bona fide loans. For instance, at the time petitioner received such advances, Smartech's board of directors had not passed any resolution which effectuated a policy of loans to officers and directors. In addition, petitioner did not give Smartech his promissory note or any other evidence of indebtedness reflecting the advances, nor did he provide any collateral or security for repayment, nor did he make any payments of either interest or principal until after the tax years in issue. Moreover, Smartech did not have any agreement with petitioner as to the time he had to repay these advances nor the rate of interest he was obligated to pay. Finally, the advances were made without regard either to the Corporation's financial ability to make them or with any evaluation of petitioner's ability to repay them. Our consideration of these factors leads us to conclude that the advances did not constitute bona fide loans. However, petitioner argues that he was authorized to make loans to employees on Smartech's behalf, and therefore the advances he made to himself were bona fide loans. To establish this authorization, petitioner *33 points to one instance when Mohr allowed him to borrow money from the Corporation and other instances where he advanced funds to employees. However, in the first instance, the loan was made only after petitioner obtained Mohr's approval, and Mohr insisted that petitioner immediately execute a promissory note evidencing his indebtedness and establishing the interest rate and time of repayment. With respect to amounts Smartech advanced to other employees, petitioner authorized relatively nominal amounts, generally for travel or relocation, advances which were to be accounted for or repaid soon afterward. These acts are not comparable to petitioner's actions with regard to the advances at issue. Moreover, if petitioner was empowered to loan himself money, we find it curious that he never once revealed or discussed his actions with Mohr. If the loans had been authorized, he certainly would have brought out their existence when the advances totaled such a relatively substantial amount that they caused shortages in Smartech's cash flow serious enough to prevent it from paying its bills on a timely basis. That no demand was made for repayment when the Corporation was short of cash *34 strongly indicates that the advances were not loans. Further, petitioner vehemently denies that his actions in any way concealed the true nature of his advances. He emphasizes that two of Smartech's bookkeepers were fully aware of his actions, showing that he did not try to conceal his actions from the Corporation. However, we discount the value of disclosure to individuals who are powerless to oppose the actions of their boss, the president of the company. Eventually, when the total of the advances reached such a magnitude that they endangered the liquidity of the Corporation, the bookkeeper did speak up, and, as a result, Mohr put an immediate end to both petitioner's advances and his employment. Petitioner also maintains that his treatment of the advances on the books in no way disguised their true nature. Although he initially charged the advances to the "employee advances" account, he later transferred them into the "accounts receivable" account, where he knew that they would be buried among the customer accounts. Petitioner knew that Mohr reviewed, on a monthly basis, only the balance sheet and income statement and, because of these transfers, Mohr would not become aware *35 of their existence without petitioner's disclosure. Thus, in fact, petitioner's actions did conceal the true nature of these advances from the one individual (Mohr) having sufficient authority to either authorize the "loans" or demand repayment. See Foster v. Commissioner, T.C. Memo. 1989-276. Nevertheless, petitioner cites Gilbert v. Commissioner, 552 F.2d 478 (2d Cir. 1977), revg. T.C. Memo. 1976-104, in support of his contention that the advances constituted bona fide loans. In Gilbert, the taxpayer was president, principal stockholder, and a director of a corporation from which he withdrew funds without authorization in an attempt to effectuate a merger which would have been favorable to both the taxpayer and the corporation. Within 2 weeks, the taxpayer assigned assets to secure the amount he owed and made an accounting to several of the corporation's officers and directors. The Court of Appeals for the Second Circuit held that in circumstances where misappropriations do not enrich or benefit the misappropriator, and there is a timely consensual recognition of an obligation to repay *36 the loans, income does not arise. Id. at 481. This case is distinguishable. Petitioner used the advances for purely personal purposes to improve his standard of living. Although petitioner argues that the more ostentatious lifestyle he could afford because of the advances would make Smartech appear larger and more profitable than otherwise, any benefit to the Corporation would, at best, be characterized as indirect and minimal. Moreover, unlike the taxpayer in Gilbert, petitioner did not pledge any assets as collateral for his alleged debt, did not reveal his advances to anyone who could question his actions, and did not acknowledge the advances as loans until confronted by Mohr, which occurred after the years in issue. Consequently, we conclude that Gilbert v. Commissioner, supra, does not aid petitioner in his arguments. Finally, we note that in finding that the advances from Smartech were not bona fide loans to petitioner, we necessarily find that they constitute income to petitioner. See North American Oil Consol. v. Burnet, 286 U.S. 417, 424 (1932). As explained by the Supreme Court in James v. United States, 366 U.S. 213, 219 (1961) *37 (quoting North American Oil Consol. v. Burnet, supra): When a taxpayer acquires earnings, lawfully or unlawfully, without the consensual recognition, express or implied, of an obligation to repay and without restriction as to their disposition, "he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent". * * * [Emphasis added.]
A rare exception to the rule arises only "where a taxpayer withdraws funds from a corporation * * * which he expects with reasonable certainity he will be able to repay, where he believes that his withdrawals will be approved by the corporation, and where he makes a prompt assignment of assets sufficient to secure the amount owed". Gilbert v. Commissioner, supra at 481; Pizzarelli v. Commissioner, T.C. Memo. 1980-118. In contrast, in this case, petitioner knew or should have known that his actions would not have been approved by the Corporation's board of directors, petitioner never assigned assets to secure the amount *38 he ostensibly owed, and there is no evidence to show that petitioner could have repaid the advances at the time they were made. Consequently, we conclude that the advances at issue were not bona fide loans and, since petitioner had unrestricted use of the funds from the time they were advanced to him, they constitute income in the year he received them. Rutkin v. United States, 343 U.S. 130, 137 (1952); Tussaud's Wax Museums, Inc. v. Commissioner, T.C. Memo. 1966-211. Additions to Tax
Respondent also determined that petitioners are liable for various additions to tax, namely (1) for 1988, the addition to tax for negligence pursuant to section 6653(a) of $ 360, plus 50 percent of the interest on the portion of the underpayment attributable to negligence, (2) for 1988, the addition to tax under section 6661 of $ 1,800, (3) for 1989, the addition to tax provided by section 6651 of $ 610 for failing to file a timely income tax return, and (4) for 1989, the accuracy-related penalty under section 6662 of $ 610. Petitioners rested on the evidence they presented to prove that there were no deficiencies, reasoning that, *39 therefore, there would be no additions to tax. Because we have held that the advances petitioner received from Smartech constitute gross income to him, we hold that petitioners are liable for the additions to tax determined by respondent. Because of respondent's concessions, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Petitioner received a car allowance of $ 4,800 during 1989, which was included as gross wages on his Form W-2, and which he reported on his 1989 income tax return. Respondent concedes that the determination on the notice of deficiency incorrectly included this amount as unreported income.↩
3. On Apr. 19, 1993, petitioners filed a Motion To Shift The Burden Of Proof to respondent. At trial, we took petitioner's motion under advisement.↩
4. The above computations were submitted by petitioners at trial. The amounts of gross profit used by petitioner for these computations differ slightly from the amounts reported by Smartech on its Federal income tax returns for 1988 and 1989.↩
5. Smartech employed, in succession, several bookkeepers during the years 1987 through 1990. Reference in this opinion to the term "bookkeeper" refers to whichever individual employed by Smartech at the time was responsible for the duties described above.↩
1. All checks are payable to petitioner unless otherwise indicated.↩
2. There is a notation on the manual check request form indicating that this amount should have been charged to employee advances.↩
3. Petitioner argues that, because this check was payable to Sheila Harper, respondent should not have added it to petitioner's income. However, admittedly this check was cashed by Sheila Harper as a travel advance to petitioner, and because petitioner has not shown that he expended these funds on behalf of Smartech, we will not disturb respondent's determination. Rule 142(a).↩
6. Petitioner complains that respondent did not designate the specific nature of the income received by petitioner -- whether it was income from embezzlement or compensation. However, no specificity is required, inasmuch as both of these types of income are includable in petitioner's gross income under sec. 61. As the Supreme Court explained in Rutkin v. United States, 343 U.S. 130, 137 (1952): An unlawful gain, as well as a lawful one, constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it. * * * That occurs when cash, as here, is delivered by its owner to the taxpayer in a manner which allows the recipient freedom to dispose of it at will, even though * * * his freedom to use it may be assailable by someone with a better title to it.↩